```
1                IN THE UNITED STATES DISTRICT COURT

2                IN AND FOR THE DISTRICT OF DELAWARE

3                           - - -

4
     GENENTECH, INC. and CITY OF  :   CIVIL ACTION
5    HOPE,                        :
                                  :
6                 Plaintiffs,     :
                                  :
7         vs.                     :
                                  :
8    AMGEN, INC.,                 :
                                  :   NO. 17-1407-CFC
9                 Defendant.      :   NO. 17-1471-CFC

10

11                           - - -

12                       Wilmington, Delaware
                         Wednesday, October 10, 2018
13                       11:02 o'clock, a.m.

14                           - - -

15   BEFORE:  HONORABLE COLM F. CONNOLLY, U.S.D.C.J.

16                           - - -

17   APPEARANCES:

18
                 McCARTER & ENGLISH, LLP
19               BY:  DANIEL M. SILVER, ESQ.

20
                        -and-
21

22

23

24                       Valerie J. Gunning
                         Official Court Reporter
25
```

2

APPEARANCES (Continued):

WILLIAMS & CONNOLLY LLP
BY:  PAUL B. GAFFNEY, ESQ.
     DAVID J. BERL, ESQ. and
     TEAGAN J. GREGORY, ESQ.
     (Washington, D.C.)

-and-

DURIE TANGRI
BY:  ERIC C. WEINER, ESQ.
     (San Francisco, California)

Counsel for Plaintiff
Genentech, Inc.

YOUNG CONAWAY STARGATT & TAYLOR, LLP
BY:  JAMES L. HIGGINS, ESQ. and
     MELANIE K. SHARP, ESQ.

-and-

PROSKAUER ROSE LLP.
BY:  SIEGMUND Y. GUTMAN, ESQ. and
     GOURDIN W. SIRLES, ESQ.
     (Los Angeles, California)

Counsel for Defendant
Amgen Inc.

- - -

---

3

1            P R O C E E D I N G S

2

3        (Proceedings commenced in the courtroom,

4    beginning at 11:02 a.m.)

5

6        THE COURT:  Good morning.  Please be seated.

7            (Counsel respond, "Good morning, Your Honor.")

8        THE COURT:  I had thought we were going to have

9    this in my chambers, but given the crowd, decided that

10   wouldn't work, so welcome.

11       MR. SILVER:  Good morning, Your Honor.  Dan

12   silver from McCarter & English on behalf of the plaintiffs.

13   It's my pleasure to appear before Your Honor the first time

14   live.

15       THE COURT:  Thank you.

16       MR. SILVER:  Happy to have you in court, Your

17   Honor.

18           With me, Your Honor, at counsel table, Paul

19   Gaffney, David Berl and Teagan Gregory of Williams &

20   Connolly on behalf of Genentech.  And because it's our first

21   appearance before Your Honor, we brought some other members

22   of our team as well to observe.

23       THE COURT:  Okay.

24       MR. SILVER:  Thank you, Your Honor.

25       MR. HIGGINS:  Good morning, Your Honor.  Jim

---

1    Higgins from Young Conaway.  I would like to echo

2    Mr. Silver's comments.  It's a pleasure to be here before

3    you.

4            With me today from Proskauer is Siegmund Gutman

5    and Gourdin Sirles.

6        MR. GUTMAN:  Good morning, Your Honor.

7        MR. SIRLES:  Good morning.

8        THE COURT:  Good morning.

9        MR. HIGGINS:  And from our client, Amgen, Thomas

10   Lavery.

11       MR. LAVERY:  Good morning, Your Honor.

12       MR. HIGGINS:  And just one housekeeping matter

13   before we get started.  There are a couple of issues today

14   that we would ask that the courtroom be sealed for.  I

15   believe there's one gentleman who is not affiliated with the

16   parties or under the protective order in this case.

17       MR. CONNOLLY:  I will step out, Your Honor.

18   Whatever you instruct me to do.

19       THE COURT:  Yes.  I think it is because I spent

20   17 years in the Department of Justice, I'm a big fan of

21   First Amendment, and like Judge Andrews, who also has that

22   background, am reluctant to shut a court proceeding

23   down.

24           Why don't we, when we get to something that you

25   think is --

---

5

1        MR. HIGGINS:  I will alert Your Honor when it

2    comes up.

3        THE COURT:  Would warrant -- I'm trying to think

4    of what comes up.

5        MR. HIGGINS:  Sure.

6        THE COURT:  I've read in the briefing --

7        MR. HIGGINS:  Sure.  Without going into detail

8    obviously, the issue of the protective order and the foreign

9    use, some of the information that might be discussed about

10   what product use we're talking about --

11       THE COURT:  Right.

12       MR. HIGGINS:  -- implicates Amgen's sensitive

13   information as well as I believe some discussion about

14   launch.

15       THE COURT:  Right.

16       MR. HIGGINS:  Potentials and what have you.

17       MR. GUTMAN:  There might also be, Your Honor, a

18   discussion regarding some manufacturing activities.  I don't

19   know exactly what Genentech and City of Hope plan on

20   arguing, but there could be references to manufacturing

21   processes as well.

22       THE COURT:  Give me one second to see the order

23   that we're going to go through these arguments.

24           (Pause.)

25       THE COURT:  So the gentleman in the back is

---

6

1  Arthur Connolly.

2         MR. HIGGINS: I'm aware, Your Honor.

3         THE COURT: It's spelled the same way as my

4  name. It's spelled the same way as Paul Connolly of

5  Williams and Connolly. There's no relations among those

6  three people.

7         MR. HIGGINS: Your Honor -- excuse me.

8         THE COURT: But, Mr. Connolly, the problem is,

9  is that the arguments, it's going to be very, very difficult

10  for me to segregate confidential versus nonconfidential

11  information.

12         It's possible that one of the arguments, which

13  we won't get to until I go through at least four four others,

14  might be sufficiently public throughout that we could

15  open -- frankly, it would just be a lot easier if I could

16  ask you to excuse yourself.

17         MR. CONNOLLY: I understand, Your Honor, and I

18  will do so.

19         THE COURT: And what I will say to you is,

20  because I do not want to disown comments I made earlier, you

21  could always make an application for the transcript, and

22  then the parties can decide what they want to do before a

23  transcript will be made public.

24         MR. CONNOLLY: Thank you, Your Honor.

25         THE COURT: Thank you, Mr. Connolly.

8

1  the other side, and we'll go from there.

2         MR. GAFFNEY: Thank you, Your Honor.

3         With respect to the protective order, there are

4  three documents, nine pages of information that disclose

5  that in connection with this product, Amgen is going to do

6  some testing at its site in Ireland. This is not the

7  formula to Coke or how they make their, the details of their

8  manufacturing, and so we have not objected at this point to

9  the confidentiality of this information, but it is basically

10  a disclosure that they are doing part of the process in

11  Ireland, where Genentech has patent rights. And so we have

12  been in these prolonged negotiations over the protective

13  order, sought the ability to use that information in those

14  nine pages to be able to provide that to Irish counsel so

15  that they would have the necessary factual basis to initiate

16  litigation to enforce Genentech's rights in Ireland against

17  that activity.

18         We thought we had an agreement on this. There's

19  a provision essentially doing the same thing, and the

20  protective order Judge Sleet entered in the Genentech/Pfizer

21  case has a number of overlapping patents and a different

22  product.

23         THE COURT: So actually, on that, just a small

24  point going forward, and I say this because I'm new to the

25  job. I got assigned some 400 cases. I can't say how many

7

1         MR. HIGGINS: Thank you, Your Honor.

2         And I would also like to introduce Melanie Sharp

3  from Young Conaway.

4         THE COURT: Good morning, Ms. Sharp.

5         MS. SHARP: Good morning, Your Honor.

6         THE COURT: All right. Why don't we take

7  Genentech's application first.

8         MR. GAFFNEY: Good morning, Your Honor. Paul

9  Gaffney, Williams and Connolly.

10         THE COURT: Good morning.

11         MR. GAFFNEY: For Genentech.

12         Your Honor, I will be addressing the matters

13  raised in our letter, and my partner, Mr. Berl, is prepared

14  to address the matters raised in response to Amgen's letter.

15         THE COURT: All right.

16         MR. GAFFNEY: I don't know whether your

17  preference is to take all of these at once, but if we jump

18  back and forth, that explains the musical chairs here, if

19  you will.

20         THE COURT: I actually like the latter approach,

21  the musical chairs approach. That's why I had decided to do

22  these things in chambers, so I think that setting lends

23  itself to that choreography, if you will.

24         Why don't you address the first issue, the

25  protective order issue, and hear you, and then we'll hear

9

1  hearings I have today and tomorrow. If you're going to have

2  an exhibit attached to a letter with multiple pages, if you

3  could direct me to the page in your briefing, that would

4  really be helpful.

5         So, for instance, I'm referring to the other pro

6  protective order that's Exhibit 12.

7         MR. GAFFNEY: Yes.

8         THE COURT: But having said that, I didn't

9  really lose any sleep over that omission because I'm not

10  really sure how persuasive it was that it was done in

11  another case.

12         MR. GAFFNEY: Fair enough.

13         THE COURT: I'm more interested in some of the

14  other issues that you've discussed about the protective

15  order, learning about that.

16         MR. GAFFNEY: Sure. But I apologize for the

17  lack of pin cites. As I prepared for today --

18         THE COURT: We're all busy.

19         MR. GAFFNEY: -- I share your frustration in not

20  being able to find them. And since I had the final sign-off

21  on the letter, that is on me.

22         So the issue really is the POSCO case and what

23  is the standard for using information obtained from folks in

24  the U.S. in litigation or pursuant to the statute here,

25  1782, that is discussed in that case. What are the

10

1  standards for using that information in a proceeding outside
2  the United States?
3          And we raised that issue in front of Judge Sleet
4  and we raised it again in the letter, and we submit that
5  those are satisfied. The other side doesn't even cite the
6  case much less the attempt to distinguish it.
7          I understand they would rather not get sued in
8  Ireland, but the reality is, is that this drug, in the
9  process of taking it from the factory to the market, it goes
10  through Ireland, it's imported into Ireland. Testing is
11  either going to be conducted or they have approval to
12  conduct the testing in Ireland.
13          The role of Ireland in the European version of
14  the product is disclosed in Europe. It's just not something
15  that, I'm frankly surprised we're back here arguing it again
16  in front of this Court for a second time.
17          There are other ways to do this. We could have
18  filed a 1782 action. You know, we could have moved to
19  de-designate the confidentiality of this tiny piece of
20  information we want that our Irish counsel says we would
21  need. But this seems to be under the case law the most
22  efficient and appropriate way to accomplish what we need to
23  do.
24          THE COURT: Well, let's say we had, instead of
25  potential litigation in Ireland, you had potential

11

1  litigation in Texas. As a matter of right, would you be
2  able to have a protective order in this case allowing you to
3  use that information to file suit in Texas?
4          MR. GAFFNEY: I think it would depend on the
5  terms of the protective order. I think you negotiate these
6  things, and if it's not covered, you would go and apply to
7  the Court and say, we would like permission to use this, and
8  it would be decided on a case-by-case basis.
9          THE COURT: And what factors would be considered
10  in that circumstance set forth?
11          MR. GAFFNEY: Well, I think it would be -- I
12  don't know the exact test other than to say it is looser
13  than the test to use it outside the United States because
14  that's an issue that the Federal Circuit has addressed and
15  has in effect incorporated the standards of the statute even
16  for proceedings like this one, where we're seeking it, to
17  modify a protective order. So I think the Court would have
18  considerable discretion to decide whether information
19  produced in discovery in this case could be used for another
20  case in another Federal Court.
21          THE COURT: And just so I understand it, are you
22  saying, you said looser. Are you saying that under POSCO
23  and Intel, the Supreme Court case that's discussed in POSCO,
24  or even under 1782, are you saying that I have more latitude
25  or it's a looser standard to share information if it's a

12

1  foreign country tribunal, or are you saying looser to
2  protect?
3          MR. GAFFNEY: Looser inside the United States.
4          THE COURT: All right. I wanted to make sure I
5  understand that.
6          MR. GAFFNEY: If I said the opposite, I
7  misspoke.
8          THE COURT: No, you didn't.
9          And you agree though in either case, it's my
10  discretion.
11          MR. GAFFNEY: Of course.
12          THE COURT: It's a discretionary call. Right?
13          MR. GAFFNEY: It is a discretionary call.
14          THE COURT: All right. So I look at the POSCO
15  factors, in particular, Factor 2 and 3. Is there any record
16  evidence that would address those two factors?
17          MR. GAFFNEY: Well, on --
18          THE COURT: When I say evidence, I don't mean a
19  hearing, but just either papers. If you want to even say
20  argument, something that has addressed these issues that are
21  of concern there. Of course, the factors come from the
22  Intel case.
23          MR. GAFFNEY: Sure. Well, there are cases,
24  we've cited one of them, and there are others we can cite
25  Your Honor. In a three-page brief you tend to economize on

13

1  the string cites.
2          The case that addressed factor 2, and I think
3  factor three again is --
4          THE COURT: You are talking about this Florida
5  case? What case are you talking about?
6          MR. GAFFNEY: Yes.
7          THE COURT: Okay.
8          MR. GAFFNEY: The NRC case in the Southern
9  District of Florida.
10          THE COURT: Right.
11          MR. GAFFNEY: Again, we have some other cites
12  where Ireland has been identified as a recognized judicial
13  forum, and we can commit those to Your Honor.
14          THE COURT: I think the fact that that's for
15  more. I mean, don't you have to come forward and explain
16  that in this particular case? That's one of the problems.
17  Let me just start with that.
18          I realize that Intel says that 1782 applies even
19  before a proceeding is formally instituted. I get that,
20  although I have to say, I have a hard time understanding it,
21  and it was in the context of a criminal case, which is done
22  differently over in some countries in Europe.
23          So one of the things, and Amgen makes this
24  point, we don't even have a proceeding. So I'm trying to
25  find -- I mean, my first reaction to this before I read

14

1 POSCO and Intel and looked at the statute was, isn't this
2 really premature? And then you get to the other two factors
3 though.
4 　　　　So we don't have a proceeding, so I guess we
5 don't know for sure what Court it would be in Ireland, or
6 maybe you do.
7 　　　　MR. GAFFNEY: We know what Court it will be in.
8 This is a case initiation -- this is a piece of information
9 we need to institute the case. You know, we have to have
10 the analogue to Rule 11 over there. We know from discovery
11 in this case that they engage in certain activities in
12 Ireland that infringe Genentech's intellectual property
13 rights, and so we have to file the case, and so we need
14 certain information and we have tried to obviously limit it
15 as much as possible to what we are asking for to be able to
16 use over there.
17 　　　　And so if the question is what are the
18 procedures in Ireland for the protection of this
19 information, I'm not sure there's a disagreement on that.
20 That is, there is an analogue to our protective order over
21 there. We would have agreed that we would support their
22 application to keep it that way.
23 　　　　I think it is a fact, as Amgen points out, that
24 the Judge in Ireland could decide, I don't -- it doesn't
25 sound secret to me and allow that piece of information to be

15

1 disclosed. So I guess it's my understanding that what
2 procedures, what would happen in Ireland, how those courts
3 work, in particular, how they treat this information is not
4 really in dispute here.
5 　　　　And we both contacted our Irish counsel.
6 They've contacted theirs. We've contacted ours. We have
7 not been able to obviously tell them anything in factual
8 detail, but I think we're getting by and large the same
9 information back about how it would work. And, again, for
10 some reason, they don't address, their letter doesn't really
11 address the test.
12 　　　　THE COURT: Well, the test is guidance, in
13 fairness to them, and it's not exactly on point. For
14 starters, you are not modifying the protective order. We
15 don't have a protective order. You have not brought a 1782
16 application. You know, I wouldn't be too critical of them
17 on that.
18 　　　　Maybe you can help me, just struggling with the
19 idea that, again, notwithstanding, I've read Intel, I've
20 read POSCO, that you get to use as a vehicle to bring a
21 case in a foreign country a discovery mechanism in a case
22 here.
23 　　　　MR. GAFFNEY: Well, the procedure -- let me
24 address it.
25 　　　　THE COURT: And especially when we're not

16

1 talking about a proceeding. Right? I get that there's
2 a proceeding in place. That I understand. I realize
3 Congress modified 1782, took out the word. Just help me
4 with that.
5 　　　　Why as a policy matter, in the absence of a
6 formal proceeding that is already existing in Europe, why
7 should you get to use the discovery mechanisms here to go
8 build a case in a foreign country?
9 　　　　MR. GAFFNEY: Let me address that by actually
10 backing up a little bit, because as you pointed out, there
11 isn't -- we have a bunch of documents and there's no
12 protective order, and the reason for that is we're dealing
13 with this statute enacted to address the procedure, if you
14 will, for biosimilar entry into the market. You'll hear it
15 a zillion times in this case, the BPCIA.
16 　　　　And what happens at the outset of the case is
17 that the statute requires the company that wants to make the
18 biosimilar product to, without any request from us, without
19 discovery requests, without a subpoena, to provide a rather
20 large amount of information, the application to the FDA and
21 other information about the manufacturing process for the
22 purpose of allowing the innovative company to evaluate the
23 extent to which what the applicant is proposing to do would
24 infringe our patents, patent portfolio protecting the
25 products and also protecting the complicated process for

17

1 manufacturing it.
2 　　　　And so that information was provided, so we
3 have -- we had a large amount of information before the suit
4 was ever filed. It was a dispute about whether we got
5 enough, but I'm assuming that's yesterday's news and we've
6 moved on.
7 　　　　But we had a lot of information. That
8 information disclosed, in addition to infringement of our
9 U.S. portfolio, the infringement of the rights in Ireland.
10 So we have looked at the mechanisms available to us as to
11 what to do about that. One of them is to file a 1782
12 action. One of them is to, we could propose to de-designate
13 this information because it strikes, you know, because what
14 they do in Ireland -- doing in Ireland the sort of things
15 that they disclose on their website that they do in Ireland
16 doesn't strike me as confidential. And the other
17 alternative is, as we did in the other case in front of
18 Judge Sleet, is to deal with it proactively in the
19 protective order. Say, look, there's a little bit here, we
20 have it. Protective orders are not designed to hide
21 wrongdoing. They are designed to allow for the appropriate
22 use of information you provide, and let's take care of this
23 now rather than complicating these already complicated
24 proceedings.
25 　　　　And so that is how we approached it. It strikes

18

1   us that it's perfectly appropriate under all of the -- this
2   case may not fit exactly like one of the other cases, but in
3   some ways that's because the circumstances we're dealing
4   with are unique.  We dealt with it in what we thought was
5   the most responsible way.
6           THE COURT:  All right.  Anything else?
7           MR. GAFFNEY:  No, Your Honor.  I just, I
8   realized with respect to the pin cites --
9           THE COURT:  Oh, that's not a big deal.  I just
10  meant it's a lot easier to me.  I get an Exhibit 12 and I
11  decided not to go through the protective order and figure
12  out where the paragraph was.
13          MR. GAFFNEY:  Fair enough.  I'm not even sure we
14  gave you the paragraph cites to our own proposed protective
15  order and those are 8, 9, 32 and 35.  And, again, the next
16  time we cite a 30-page document, we'll give you a little
17  more direction on where to find what we are pointing you
18  to.
19          THE COURT:  All right.
20          MR. GAFFNEY:  Thank you, Your Honor.
21          THE COURT:  All right.  And then Mr. Gutman, or
22  no?
23          MR. HIGGINS:  Mr. Higgins, Your Honor.
24          THE COURT:  Mr. Higgins.
25          MR. HIGGINS:  I will be addressing this.

19

1           So just to start, Mr. Gaffney indicated that
2   they needed this information over in Ireland in order to
3   establish a necessary factual basis to bring suit.  And just
4   a few moments ago he said that this information is
5   effectively available on Amgen's website, so what's the big
6   deal?
7           So it raises the question, if it's available on
8   the website and you can get the requisite factual proof
9   needed through that avenue, why are you, you know, insisting
10  on bringing Amgen confidential information to produce under
11  the BPCIA into the mix?
12          THE COURT:  Let me just interrupt you.
13          MR. HIGGINS:  Sure.
14          THE COURT:  I didn't, and I don't hear that well
15  sometimes, and I certainly don't pick up on everything.  I
16  didn't understand Mr. Gaffney to make that assertion, so let
17  me just ask you this though to cut right to the chase.
18          As I understand, there are three documents, nine
19  pages.
20          MR. HIGGINS:  Correct.
21          THE COURT:  Is it your position, your client's
22  position that those three documents are public?
23          MR. HIGGINS:  No.
24          THE COURT:  Okay.
25          MR. HIGGINS:  They're not.

20

1           THE COURT:  So then, I mean, we're talking about
2   confidential information.  Right?
3           MR. HIGGINS:  Fair, Your Honor.
4           THE COURT:  All right.  So I just want to make
5   sure.
6           MR. HIGGINS:  Sure.
7           THE COURT:  All right.
8           MR. HIGGINS:  So back up on the same sort of
9   theme.  They need the necessary factual basis, they say.
10  What was omitted from Mr. Gaffney's presentation, I think,
11  is the fact that long ago we agreed that they could share
12  confidential information with their outside Irish counsel in
13  order to review whatever facts they believe exist about what
14  is going on in Ireland in order to bring a suit.
15          What we object to -- well, let me back up a
16  little further.  What we objected to was their using the
17  materials in the Irish litigation, putting them on the
18  docket, making them public.
19          They have backed off of that, but they still
20  intend or would like to include these pages in these case
21  initiating documents, which are statement of claims and
22  particulars of infringement which, as I understand it, are
23  not filed with the Irish Court, but they're served on Amgen,
24  and then the Court, during the course of proceedings, will
25  hear about them.

21

1           And as was represented, both sides have
2   discussed this with Irish counsel independently, obviously,
3   and --
4           THE COURT:  Hopefully, none of my cousins.  I
5   have six cousins who are lawyers in Ireland and one who is a
6   judge.
7           MR. HIGGINS:  I don't think so.
8           THE COURT:  His name is Coffey, just in case
9   that ever comes up.
10          MR. HIGGINS:  And after discussing it with our
11  Irish counsel, it was clear to us that if these materials
12  are included in these case initiating documents and then
13  later referenced, whether by an attorney, a witness or even
14  the Court asking a question, the Court rules in Ireland to
15  permit public access basically, or at least an application
16  for it.
17          So our concern is that in addition to the fact
18  that as Mr. Gaffney indicated, it's completely discretionary
19  over in Ireland whether to honor a confidentiality agreement
20  that the parties have about these materials.  Our concern is
21  that we'd have to go into every hearing seeking to seal and
22  make sure that nobody was going to say anything that might
23  implicate these materials or else risk the materials
24  becoming public.  And the reason that these materials are
25  sensitive is because, and Mr. Gaffney sort of tossed it

22

1 aside as, you know, this is nothing.  In fact, this is the
2 type of information that biologic and pharmaceutical
3 companies keep very, very secret.  It's effectively trade
4 secrets.  It's information about which manufacturing
5 facilities are capable of this, which are capable of that,
6 and that's what we would like to protect here.
7        And it's also noteworthy that these materials
8 don't only implicate the Irish information that they are
9 interested in, but these materials have information about
10 other Amgen manufacturing facilities in other locations.
11        So from our perspective, we've said they can
12 share the information with their Irish counsel.  Their Irish
13 counsel can then decide whether they think it makes sense to
14 file suit.  They don't need any more than that.  They have
15 not filed suit.  I think that's a little bit telling.
16        You know, and if they were to file suit, our
17 position would be that Ireland has discovery processes, and
18 if the judge over there thought that these pages were
19 subject to discovery under Irish rule, then great.  I find
20 it highly improbable that if suit was filed over there,
21 Amgen would be somehow able to conceal what it's doing over
22 there.
23        So to me, it strikes us as an effort to get at
24 Amgen's information about where things are being
25 manufactured and it's completely unnecessary, and it's just

23

1 an unnecessary and an unacceptable risk to Amgen's
2 confidential information to allow it to be used over there.
3        THE COURT:  So just so I understand your
4 position, you're okay with Irish counsel having it.  Does
5 Irish counsel already have it?
6        MR. HIGGINS:  I hope not.
7        THE COURT:  Okay.  I just wanted to make sure I
8 didn't miss anything there.
9        MR. HIGGINS:  No.
10        THE COURT:  You're okay with their Irish counsel
11 having it, but their Irish counsel, what the risk you want,
12 you're afraid of is and want to avoid is the Irish counsel
13 serving those papers to other counsel because that at some
14 point could open the door to the Irish Court taking it?
15        MR. HIGGINS:  So I may not have --
16        THE COURT:  Again, don't worry about apologizing
17 to me.
18        MR. HIGGINS:  No, no.  So, okay.  So they can
19 share it with their Irish counsel who can then decide
20 whether they have a good-faith basis to bring the claim.  In
21 Ireland, as we understand it, you can file based on
22 speculation.  It's actually much easier than in the United
23 States and discovery runs its course and you either prove
24 your case or you don't.
25        Our concern is not with Irish counsel having it

24

1 in their head what's on those pages and then filing suit and
2 letting Irish discovery take over.  It's with Irish counsel
3 not attaching the documents, I'm pretty sure they agreed
4 they wouldn't do that, but including references to what
5 these materials are in the papers that are served on Amgen,
6 and then eventually during the course of court hearings,
7 they're discussed.  And our understanding from counsel in
8 Ireland is that any discussion of the contents of these
9 materials that are referenced in these case initiating
10 pleadings, any reference to it would open the door to public
11 access, including from competitors, the press, what have
12 you.
13        THE COURT:  But you're okay with Irish counsel
14 reading the documents?
15        MR. HIGGINS:  They would be subject to the
16 protective order.
17        THE COURT:  Right.
18        MR. HIGGINS:  Yes.
19        THE COURT:  They just could not reference the
20 documents or disclose the contents of the documents?
21        MR. HIGGINS:  Right.
22        THE COURT:  And then what happens if then they
23 file suit, they serve papers, there's no reference to them,
24 and then the Irish judge says, okay.  I need to understand
25 the basis of the lawsuit.

25

1        MR. HIGGINS:  Well, that's when discovery takes
2 over in Ireland and they serve requests and we produce them
3 and they find out what's going on in Irish facilities.
4        THE COURT:  And so the Irish lawyer is okay to
5 ask for documents that would include the three documents at
6 issue?
7        MR. HIGGINS:  Well, the three documents at issue
8 may or may not be appropriately requested given that they
9 are confidential under the BPCIA.  But in theory, the Irish
10 lawyer would be able to ask about, you know, just documents
11 sufficient to show or whatever manufacturing.
12        THE COURT:  My point is so the same Irish lawyer
13 is hired and that Irish lawyer gets to read the documents.
14 He can't reference them or disclose them to anybody else or
15 the Court.  And I guess if the Court asks counsel to justify
16 the lawsuit, he couldn't reference the documents without
17 violating the protective order you want.  Right?
18        MR. HIGGINS:  Correct.
19        THE COURT:  But the Irish counsel could serve
20 discovery requests on Amgen that would cover the same
21 documents that we're talking about.  Is that correct?
22        MR. HIGGINS:  To be fair, I don't know exactly
23 how discovery works in Ireland, but in theory, that is
24 correct.
25        THE COURT:  And if the Irish counsel serve

26

1 discovery requests for the same documents on Amgen at that
2 later point, I assume Amgen would produce it probably with
3 some protective order in place. Is that right?
4        MR. HIGGINS: Yes. We would have to see what
5 the protective order looks like and potentially deal with
6 redactions and what have you.
7        I think another issue here is that we're dealing
8 with this in the context of entering a protective order.
9 These issues are typically handled under 1782, and with full
10 briefing, potentially declarations about the risks that
11 Mr. Gaffney suggested that we're all on the same page about
12 Irish counsel's views, I don't think that's the case.
13        We would, you know, be happy to submit a
14 declaration indicating in a little more detail from somebody
15 who more appropriately would be speaking to some of the
16 concerns about the materials being used in any way in the
17 Irish case.
18        So I mean we've been at this for, Mr. Gregory
19 and I have been at this for about eight months now back
20 and forth on the protective order. There are a few other
21 issues we need to get through, but it has largely been this,
22 and for at least the last few months, we've been saying,
23 let's just get a protective order entered. If you want to
24 deal with this issue, we can deal with it on the side. It
25 has been holding up the protective order unnecessarily.

27

1 Their insistence on including this that has held up the
2 process.
3        THE COURT: All right. Anything else on that
4 issue?
5        MR. HIGGINS: Yes. Just one point on the POSCO
6 case. I don't think the cases are at all similar. In that
7 case, at page 1377, the Court makes clear that the documents
8 they are dealing with were produced, they were subject, they
9 were compulsively produced. They were subject to compulsory
10 process, so it was a party that wasn't cooperating in
11 discovery.
12        Here, Amgen is cooperating in discovery here,
13 and if there's an Irish suit, we'd be cooperating there. So
14 we just don't think that it's necessary to --
15        THE COURT: Yes. I mean, this is where I am on
16 that. Part of me just thinks by not ruling on it now, by
17 not including it, this is going to get litigated down the
18 road. They'll bring a 1782 action, and you've already teed
19 it up, to some extent, so shouldn't I just allow the
20 information to broaden the protective order in this case.
21        And when you say things like, well, Amgen is
22 going to cooperate in Ireland fully, it makes me think,
23 isn't this just as a practical matter, isn't it easier for
24 me to expand the scope of the protective order here and
25 allowing the sharing to occur now, because it sounds like

28

1 when you say something like that, that you're going to
2 provide it to them in the end anyway.
3        MR. HIGGINS: I don't know.
4        THE COURT: The flip side is, and I want
5 Mr. Gaffney to talk about this. I don't feel like I have
6 enough concrete facts in front of me to really know what at
7 this stage the Irish Court would do with it, and so that
8 you might be more protected and fairly more protected if I
9 just don't allow the documents to be shared at this point
10 and then see what unfolds in Ireland. So that's where I
11 am.
12        MR. HIGGINS: Just one point. You said it
13 sounds like you're saying Amgen would cooperate and produce
14 this document in Ireland. It depends on the Irish discovery
15 process. We would produce whatever information is requested
16 subject to privilege and everything else. I just wanted to
17 make sure we're not just wasting the Court's time because
18 we're necessarily going to turn this document over --
19        THE COURT: I don't think anybody is wasting my
20 time on this.
21        MR. HIGGINS: -- if they decide when and if to
22 bring suit. Thank you, Your Honor.
23        THE COURT: All right.
24        MR. GAFFNEY: If I may clarify something first,
25 Your Honor, I did not say that -- I didn't mean to say that

29

1 their manufacturing activities as to this product in Ireland
2 are on their website. The website says we have a facility
3 in Ireland and we do a bunch of testing on products, so the
4 incremental disclosure would be a bases.
5        It sounds like, and I'm almost embarrassed to
6 say this, but we're much closer to an agreement than I
7 thought we were. It sounds like they're okay with us filing
8 suit in Ireland and telling our Irish counsel as much
9 information, or in showing the Irish counsel the documents
10 to get comfortable that he or she has the -- Rule 11
11 basis or analogue to that under Irish law.
12        THE COURT: That's what it sounds like to me.
13        MR. GAFFNEY: And then we can proceed.
14        THE COURT: That's exactly what it sounds like
15 to me.
16        MR. GAFFNEY: And so perhaps just a stipulation
17 of some sort that they conduct, they import, or they have
18 approval to import a bases in Ireland and they have a
19 approval to conduct testing in Ireland. Those are the facts
20 we need to establish to get to file our lawsuit. And if we
21 don't need a document to do that, it shouldn't get their
22 documents or have fights over their documents or anything
23 like that. I just want to be able to bring the lawsuit and
24 let it proceed.
25        THE COURT: Well, it sounds to me like they've

30

1    actually said that on the record.
2         MR. GAFFNEY: Yes.
3         THE COURT: We can ask for just a further
4    confirmation. Is that the truth?
5         MR. HIGGINS: Just to be clear, we're talking
6    about this limited number of -- we are not talking about
7    opening the doors, you can show them anything you want.
8         MR. GAFFNEY: Sure.
9         MR. HIGGINS: We're talking about the documents.
10   And it's for the purposes of advising them, giving them
11   information that they can use to base the lawsuit on. It's
12   not to use the documents in the litigation.
13        MR. GAFFNEY: If you may give me one moment to
14   confer with my colleagues who have been dealing with Irish
15   counsel and make sure that there's not a problem with that,
16   and I will be right back.
17        (Pause while counsel conferred.)
18        MR. GAFFNEY: There are probably a lot of
19   Gaffneys over there who are lawyers, too. I probably should
20   have called cousin Shawn before I came up here. But it
21   sounds like we're fine.
22        So long as we don't, upon filing the suit, get a
23   motion that says, we have no factual basis to allege --
24        THE COURT: I mean, if that happens, right, I
25   would be sending the Irish judge a transcript of this

31

1    hearing.
2         MR. GAFFNEY: Sure.
3         THE COURT: Who knows what would happen over
4    there.
5         MR. GAFFNEY: And that once discovery starts,
6    they are not going to say that, oh, our Irish entity doesn't
7    have these documents, and you are not allowed to have them,
8    in which case, we'll come back here.
9         THE COURT: I was going to say, it ends now, you
10   have a 1782, and I am much more informed about the POSCO
11   factors. It just seems to me that's a better way to resolve
12   this.
13        MR. GAFFNEY: That's fine, Your Honor.
14   Hopefully, you've heard the last of us on this. We do want
15   to get going and protecting our rights and not let it get
16   caught up in a bunch of hoo-ha. It sounds like we're past
17   that.
18        THE COURT: All right. So then in terms of
19   bringing this issue to a head and resolving it, it sounds
20   like you'll agree to sign the protective order as it
21   currently is drafted without addressing the sharing of
22   information with Irish counsel. Is that right?
23        MR. GAFFNEY: Right, although I don't know if it
24   requires a provision to allow us to share it. We're allowed
25   to share the document with Irish counsel.

32

1         THE COURT: I will tell you what. Why don't you
2    do that then. I'm not going to rule on that. You guys go
3    back. You revise the scheduling order to reflect that you,
4    that Genentech is permitted to share the contents of the
5    documents in question with their Irish counsel, and I think
6    we have that issue taken care of.
7         MR. GAFFNEY: Okay.
8         THE COURT: All right. Do you agree?
9         MR. HIGGINS: I do. Can I have just one minute,
10   Your Honor?
11        THE COURT: Sure.
12        (Pause.)
13        MR. HIGGINS: That's fine, Your Honor.
14        THE COURT: All right. That's great. Thank
15   you.
16        All right. Issue No. 2. Mr. Gaffney, you're
17   going to do that again. Right?
18        MR. GAFFNEY: Yes, Your Honor. Issue No. 2 is
19   the documents from the other case. So by way of background,
20   we have claims for damages in this case. We have also
21   claims for declaratory relief that their product infringes
22   our patents, but we have a claim also that the manufacturing
23   or some of the manufacturing conducted to date is outside
24   the regulatory safe harbor in 271(e). That is at a certain
25   level of generality the same claim that Amgen tried last

33

1    year before Judge Andrews' against Hospira, which is trying
2    to commercialize a copy of one of Amgen's branded drugs. So
3    Amgen is in both sides of this business.
4         They brought that case to trial. They won a
5    $70 million judgment on a reasonable royalty basis that
6    Hospira was ordered to pay notwithstanding that they're
7    sold. So the manufacturing, the building of a stockpile
8    infringed the patents. In Alice it was outside the safe
9    harbor, and that the appropriate damages were, talking about
10   lump sum license payment that you would have paid had you
11   negotiated for the right to make that in preparation of a
12   launch. And so it is the mirror image certainly of that
13   level of generality of the case that we are bringing and
14   that Amgen is defending.
15        Amgen won the case and Judge Andrews recently
16   issued his order denying the JMOL motion, and so citing the
17   evidence that Amgen put on through, among other things, its
18   FDA regulatory expert about what is and isn't necessary to
19   gain FDA approval, and therefore arguably within the
20   regulatory safe harbor.
21        And so we asked for that information in
22   discovery. As I understand, Amgen's response is there's no
23   basis to find, to apply the doctrine of judicial estoppel,
24   and that there's no use that we could have of any of these
25   materials to cross-examine their experts or their witnesses

34

1   or what have you, and I guess my response to that is, we
2   don't know that. I mean, we don't have to take their word
3   for that. This is discovery. It may very well be that
4   Your Honor doesn't let this in at trial, or Your Honor does
5   not find that these were admissions, or that it's not an
6   appropriate cross-examination of a witness. But that is not
7   something that can be decided on this record. It is
8   relevant. A party's position that it took on the same
9   issues and the same legal issues and the same regulatory
10  practices are relevant.
11          THE COURT: So let me ask you, explore that a
12  little bit with you. I'm going to guess that there may be
13  privilege issues that arise in this case and is it going to
14  be your position if there are privilege issues that are
15  litigated here, that you're entitled to find out what
16  positions Amgen took on similar privilege issues in the
17  Hospira case? I mean, why should it matter just because
18  there's a legal issue that's litigated here, and that legal
19  issue was litigated in another case, that becomes, that
20  Amgen's position on that legal issue in the other litigation
21  is relevant here?
22          MR. GAFFNEY: Well, there is a world where what
23  I say in one case on the scope of the attorney/client
24  privilege under the Federal Circuit cases and if I win, I
25  suppose that could be meaningful to a judge in the second

35

1   case under the standards of judicial estoppel. But that's
2   not what we're talking about. The positions we are taking
3   is, it's more of a factual issue or an expert issue. Well,
4   what conduct engaged in by a biosimilar applicant is
5   sufficiently remote from the regulatory process to fall
6   outside the safe harbor? You know, where does one draw the
7   line on manufacturing a stockpile prior to launch legally?
8   It's an important, a central issue in this case. Judge
9   Andrews said it was a factual issue, so not amenable to
10  summary judgment. And so the positions that Amgen took on
11  that certainly are useful and bear on if any effort to take
12  the opposite position in this case.
13          Your Honor may say, I'm sorry, you can't argue
14  one thing to Judge Andrews and something else to me,
15  especially when you won that case. That's standard judicial
16  estoppel.
17          Your Honor might say, well, the positions your
18  expert took in that case that you submitted to the Court or
19  to the jury contradict positions you are taking in this
20  case, and that's totally appropriate for Mr. Gaffney or Berl
21  or Gregory to cross-examine your expert on.
22          And so --
23          THE COURT: Well, I get if it's the same expert.
24  I get that. But if it's not the same expert, I'm having a
25  hard time understanding how you get to bring in arguments

36

1   that are made in another case -- when you say it's the exact
2   same issue, it's not exactly the same. Right? It's not the
3   same drug, it's not the exact same manufacturing process.
4   Right?
5           MR. GAFFNEY: Well, the difference in the drugs
6   is irrelevant. What matters is what conduct was undertaken,
7   what manufacturing activities were undertaken, and for what
8   purpose.
9           THE COURT: And then to compare the
10  manufacturing processes. I mean, we have to engage in a
11  minitrial to figure out how similar they are?
12          MR. GAFFNEY: I don't think so, and, again,
13  that's an issue of -- I mean, that's an issue of exclusion,
14  right, about what the scope of the trial is going to be.
15  But to say -- I mean, they have, like, every law firm, you
16  have your file of a case. It's on your hard drive or
17  whatever they call them these days, and you can produce it
18  pretty easily. You just copy it and move it over, put it up
19  on an FTP site.
20          So it's not a burden. It's just, it might be
21  useful and it might not be useful, but we have no way of
22  knowing. It might be something Your Honor lets in, it might
23  not be, and we have no way of knowing.
24          And so like I said, this is discovery. I mean,
25  we're already -- the issue here is, you're seeing a hint of

37

1   it in the next issue, which is, you know, what is the
2   appropriate methodology for calculating discovery in a case
3   where someone has made a bunch, but hasn't sold it, and they
4   had an expert witness who said, you know, the launch date is
5   an important factor and, you know, we're not hearing in this
6   case the launch date isn't an important factor.
7           Again, there may be judicial estoppel problems
8   here, which is an issue for the Court. Right. I mean,
9   that's not a party estoppel issue, but it's an issue that
10  courts don't allow you to say one thing to one judge to win
11  and something else to another judge if it contradicts it.
12  So there's no way to evaluate that without seeing what they
13  submitted to the court.
14          We're not asking for the whole file in the case.
15  We're not asking for everything that was exchanged. We are
16  asking for testimony that was taken, briefs that were filed,
17  expert reports that were served.
18          THE COURT: Okay.
19          MR. GAFFNEY: Now, none of their cases, by the
20  way, deal with the, you know, their cases about, well, you
21  shouldn't allow discovery -- you shouldn't allow me to go
22  take discovery in another case, and those weren't judicial
23  estoppel cases. And the judicial estoppel case they cite,
24  the Montrose case, not the case where the party prevailed,
25  not a case where the Court might have concerns about a

38

1 litigant talking out of both sides of its mouth.

2 So I don't think they cite cases that support

3 the, or that undermine the positions that were taken here.

4 Again, it's just a discovery issue. The issue of

5 admissibility is for a later date.

6 Thank you, Your Honor.

7 THE COURT: Thank you.

8 Is it Mr. Sirles?

9 MR. SIRLES: Yes.

10 THE COURT: All right.

11 MR. SIRLES: Good morning, Your Honor.

12 THE COURT: Good morning.

13 MR. SIRLES: I think you hit the nail on the

14 head with your concern about the lack of similarity between

15 the two cases and the lack of relevance that would exist

16 merely by the fact of the same legal dispute in two

17 different lawsuits.

18 In our view it's the same thing as asking for

19 anything Amgen has said about infringement or invalidity

20 about different patents, products, parties. We don't see

21 any factual similarities between the two cases. Obviously,

22 Amgen is on the other side, but the product is different,

23 the processes are different, the patents are different.

24 And to address what Mr. Gaffney was saying about

25 the fact we could just click it over from a hard drive or

39

1 something like that and produce it, Rule 26 has requirements

2 of relevance and proportionality, and the mere fact that a

3 party can produce something is not a justification for

4 requiring it to be produced.

5 And in this case there is no relevance, and on

6 the proportionality element, you see in their letter brief

7 that they've retrieved publicly available materials from the

8 docket, and we don't think there's any place for those

9 materials in this case to begin with, but what is the

10 proportionality in asking Amgen to go search its files

11 for what materials may be confidential and not in the

12 public record and may be redacted and subject to protective

13 orders in another case? There's no proportionality in doing

14 that in this case because there's no relevance to the

15 materials.

16 THE COURT: Well, I mean, how many materials are

17 we talking about? I mean, you would think, I think, there's

18 probably litigation files that probably are relatively easy

19 to access. No?

20 MR. SIRLES: That's a good question, Your Honor.

21 I don't know the answer to that off the top of my head, but

22 the issue to us is, Amgen should not be compelled to produce

23 materials that have no relevance, and the judicial estoppel

24 argument, Your Honor, I don't think has any merit to these

25 materials.

40

1 I don't believe there's any way Amgen could be

2 judicially estopped from defending against infringement on

3 different facts that were present in the other case. How

4 could Amgen possibly take an irreconcilably inconsistent

5 position about its manufacturing activities and another

6 party's manufacturing activities? I don't think that could

7 possibly apply, and that was the point of citing that case

8 that counsel referenced.

9 THE COURT: Anything else?

10 MR. SIRLES: I think that's all, Your Honor.

11 Thank you.

12 THE COURT: Thank you.

13 Just a second. Mr. Gaffney, you can step up.

14 Go ahead.

15 MR. GAFFNEY: We look at this as a standard

16 discovery dispute. Is there relevance and is there, you

17 know, proportionality or burden, or is there a reason not to

18 require the production of relevant evidence?

19 Again, the issue of judicial estoppel makes it

20 relevant. The potential use of the materials, the expert

21 reports as admissions, if they were ever submitted to the

22 Court, makes it relevant.

23 It's not simply an issue -- let me put a little

24 factual meat on the bones here, because it may help Your

25 Honor understand this.

41

1 So -- I'm making sure there's no strangers in

2 the courtroom.

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24 Okay. So I would like to know what positions

25 they took as to how many PPQ runs, or they are within the

42

1   safe harbor if they took positions contrary to that in the
2   other case, because it would be useful.  It would bear on
3   the credibility of their witnesses.  It may be a judicial
4   admission.  There are all sorts of things that could be
5   relevant.  And we would like to see it for that reason,
6   because this is going to be, this is going -- I'm just
7   giving you a preview.  This issue of whether they're allowed
8   to sell the massive amount of product they made during their
9   pre-launch manufacturing is going to be a huge issue in this
10  case.  The scheduling order already contemplates that
11  there's a special summary judgment proceeding set up to
12  address that issue.  The right to a jury is going to hinge
13  on that.  All kinds of case management issues are going to
14  follow from it.  We're taking a lot of discovery on it.
15  It's going to be experted to death.  And so that's why we
16  want this stuff.
17          We have -- the requests are not that broad.  We
18  asked for trial exhibits, expert reports, written discovery
19  back and forth, any briefs they filed on the issue, and any
20  hearing transcripts not otherwise available, and deposition
21  transcripts where relevant on these issues.
22          And so I would ask them for everything that is
23  generated in the case, correspondence back and forth and the
24  notes and everything else.  We are not asking for anything
25  privileged, so protective order to protect any confidential

43

1   information.  But this is a big issue.  This is not a
2   collateral issue in the case.  This is, this is going to
3   drive this litigation, take up your time, take up your
4   bandwidth, because the consequences are so significant.
5   There could be a huge damage request associated with it
6   because this is a three billion a year U.S. sales drug and
7   my client can suffer massive losses in the event of a launch
8   with material they are not entitled to sell or that they
9   infringe.
10          THE COURT:  What about the burdens that this
11  puts on Amgen in terms of protecting third-party interests
12  that were implicated in the other case, in terms of making
13  sure they comply with any protective order provisions in the
14  other case?  I mean, that is a burden.
15          MR. GAFFNEY:  I think Hospira is active, the
16  case is still going on.  If Hospira wants to protect
17  information produced in this case, we're not going to object
18  to that.  I mean, this is not Amgen's confidential
19  information.  This is Hospira confidential information to
20  the extent it's covered by a protective order, and Hospira
21  is in a position like every litigant is -- like every
22  litigant is, is to protect material produced in other
23  litigation.
24          We do it all the time.  These are big cases and
25  stuff gets discovered and, you know, you are asked to -- I

44

1   give letters five times a year saying, we've been asked to
2   produce this stuff in another case, let us know what you
3   want to protect.  It's ordinary course.  This is big stakes
4   litigation.  We're all grownups, and we have no interest in
5   making any use out of Hospira's secrets.  That's not what
6   that is about.
7          THE COURT:  All right.
8          MR. GAFFNEY:  Thank you.
9          THE COURT:  Well, here's where I am on this.  I
10  just think it's a stretch to argue in the abstract that
11  judicial estoppel would apply, and I realize your point,
12  which I actually take, which is that can be addressed in the
13  admissibility issue down the road.  That said, I think it's
14  a stretch to say it's relevant whether we don't know -- I
15  mean, if you had the same manufacturing processes, different
16  story perhaps.
17          You mentioned, for instance, that you would like
18  to know how many runs they did in excess of what they needed
19  to actually have for the FDA.  I think that would depend on
20  the facts of the case.  Very, very fact specific.  And so I
21  think what really you are trying to get, essentially what I
22  call legal admissions, legal arguments, and which I think
23  border on irrelevant, if they're not irrelevant.  And you've
24  already got access to a number of documents in the case, and
25  so I'm going to deny the request, but what I'm going to do

45

1   though is, and it's a different story if they are using the
2   same expert witnesses.  If information came to light that
3   suggested that there were, that the factual circumstances
4   that were at issue are somehow exactly the same in this
5   case, I would entertain it at that point.
6          MR. GAFFNEY:  Your Honor, would it be possible
7   to modify the request to just ask for the expert report
8   and deposition of their regulatory -- their FDA person who
9   said --
10          THE COURT:  Right.  That seems to me exactly --
11  that's like a legal argument to me.  It's how are we
12  interpreting the regulations in specifically a factual
13  context, which is not this case.  And I'm not saying I
14  wouldn't push for it if I were in your shoes, and I would
15  feel differently if it were the same expert, but we don't
16  know who the expert is in this case.  So I just think it's a
17  stretch and I don't think it's necessary.  We've got enough
18  issues and enough discovery in this case, so I'm going to
19  deny it.
20          MR. SIRLES:  Thank you, Your Honor.
21          THE COURT:  All right.  Next issue.
22          MR. GAFFNEY:  Your Honor, the next issue has to
23  do with --
24          THE COURT:  And actually, I'm sorry.  Just to
25  be perfectly clear, because I'm going to have the transcript

46

1    memorialize my decisions with respect to the pending issues,
2    so I'm going to deny the request of Genentech to compel
3    the production of materials from the Amgen versus Hospira
4    case.
5            All right.  Now, go ahead.  Sorry, Mr. Gaffney.
6    You're going to your third issue.
7            MR. GAFFNEY:  Yes.  The third issue has to do
8    with discovery of information about their launch plans which
9    have been redacted from the document production, and there
10   have been some witness instructions on that.
11           So --
12           THE COURT:  And actually, Mr. Gaffney, I'm going
13   to save you a breath.  I'm inclined to rule in your favor on
14   this, so why don't I hear from the other side.
15           MR. GAFFNEY:  Thank you, Your Honor.
16           MR. GUTMAN:  Good morning, Your Honor.
17           THE COURT:  Good morning, Mr. Gutman.
18           MR. GUTMAN:  So on this launch date issue, I
19   think there are a few fact that deserve to come to your
20   attention.
21           THE COURT:  Okay.  You characterize it as a
22   launch date issue.  It seems to me that the discovery goes
23   beyond just the launch date.  It goes to all sorts of issues
24   about the launch, and you're going to argue that you fall
25   within the safe harbor.  Correct?

47

1            MR. GUTMAN:  Yes, Your Honor.  I mean --
2            THE COURT:  So why isn't that all very relevant
3    to that issue?
4            MR. GUTMAN:  So to just back up for a second,
5    we've already provided testimony about our anticipated
6    launch date.  We had a seven-hour deposition with a 30(b)(6)
7    witness where she testified, this is Ms. Elson.  And this is
8    referenced in our letter to the Court of yesterday, that Ms.
9    Elson testified that Amgen doesn't have a launch date, so
10   there is no, there is no concrete launch date.  So we can't
11   tell the plaintiffs, this is the date by which we're going
12   to launch.  And there has been testimony on that, and so we
13   have not, we have not precluded them from exploring what our
14   launch date is.
15           Having not really liked that answer, the
16   plaintiffs have sort of switched gears and have been
17   pursuing launch date scenarios, so not when is your launch
18   date, but, you know, what are the war games that you guys
19   are undertaking in order to determine what possible launch
20   dates there would be?
21           THE COURT:  Right.  But isn't that all relevant
22   to testing the assertions your witnesses made about launch
23   dates, isn't that all information that's relevant to the
24   safe harbor issue?  And so other than privileged
25   information, why shouldn't they be entitled to it?

48

1            MR. GUTMAN:  Well, so we disagree that it's
2    relevant to the safe harbor issue.
3            So on the safe harbor issue, the issues are, why
4    did we manufacture something?  How much did we manufacture?
5    And those are all issues that we're providing immense
6    amounts of factual discovery on.
7            Again, we've had a seven-hour 30(b)(6)
8    deposition.  We've provided plaintiffs with an enormous
9    volume of documents that relate to our decisions for
10   manufacturing the material that they are saying falls
11   outside the scope of the safe harbor protection.
12           THE COURT:  Aren't the documents though that
13   deal with the launch plans for Mvasi?  Is that how you
14   pronounce it?
15           MR. GUTMAN:  That's a good question, Your Honor.
16   I will probably embarrass myself and I would say Mvasi.  But
17   tomato, tomato.
18           THE COURT:  Oh, okay.  Mvasi.  But aren't they
19   relevant to those issues that you just described?
20           MR. GUTMAN:  Well, they're not, because what
21   plaintiffs are arguing is that we fall outside the scope of
22   the safe harbor because we were engaged in commercial
23   manufacturing, so we weren't engaged in manufacturing that
24   was, and I'm testing my recollection of the specific
25   language of 271(e)(1), but that our manufacturing was not

49

1    for FDA regulatory purposes.
2            Now, we disagree.  You know, they say, well, you
3    manufactured lot X because lot X you infringe by having
4    manufactured lot X because there was no FDA regulatory
5    purpose for manufacturing that lot, and therefore it was
6    commercial and therefore, you infringed.  That's their
7    position.
8            We're saying, no, you have it wrong.  We did
9    manufacture that material for FDA purposes, and so all of
10   the factual issues that underlie an analysis of whether our
11   activities fall within the scope of safe harbor, the parties
12   have been engaging in vigorous discovery relating to those
13   underlying factual issues.  Again, how much material did we
14   manufacture?  Why did you manufacture that material?  Why
15   was it necessary?
16           Plaintiffs have even gone so far to argue that
17   specific, specific computer algorithms that were used in
18   databases is relevant to the issue of why we were
19   manufacturing things.  And we've been producing a lot of
20   discovery on that, and we have not heard any complaints by
21   plaintiffs about their ability to determine whether, or to
22   develop their case on the safe harbor issue given the amount
23   of discovery that has been produced.
24           And so this isn't a situation where plaintiffs
25   are completely unable to develop an argument that somehow

50

1   our manufacturing activities fall outside the safe harbor.
2   They've gotten --
3           THE COURT:  Would you agree that the redactions
4   to the documents and issues are relevant to that issue?
5           MR. GUTMAN:  No.
6           THE COURT:  It sounds like what you are saying
7   is, they got some information and they don't need any more,
8   but now you are going beyond that.  You are saying the
9   redactions aren't even relevant to that information?
10          MR. GUTMAN:  Yes.  So what they are saying is,
11  they are arguing that we need information that when you plan
12  on launching in order to determine whether your activities
13  were for the purpose of FDA regulatory reasons, and that's
14  where their argument about relevance falls apart.  They have
15  not tried to explain why the launch timing, and, again,
16  these are war games.  These are, you know, here's when we
17  might launch in view of information from lawyers pertaining
18  to freedom to operate versus, you know, different patents.
19  These are, these are really attenuated discussions that bear
20  on the issues of why we manufacture certain product, which
21  is really directly related to FDA regulatory issues.  That's
22  why they are seeking information from the Hospira case, you
23  know, regarding positions that we took in Hospira about what
24  the law is surrounding safe harbor.
25          And so what I'm suggesting to the Court, Your

51

1   Honor, is that, you know, first of all, they have the
2   information that bears directly on the issue of safe harbor.
3   Again, here's why we manufacture a certain lot of material.
4   Here's why we manufacture that amount of material.  Here's,
5   you know, when we manufactured it.  All of that, the FDA
6   communications surrounding the manufacturing of that lot.
7   That is the information that bears directly on the issue of
8   safe harbor.
9           This information does not bear directly on the
10  issue of safe harbor.  This is something that they're
11  arguing they want simply because they point to an argument
12  in the Hospira case where Amgen made an argument relating to
13  different facts, different patents, different products
14  regarding launch information that was voluntarily produced
15  by Hospira.  And that's a big difference in this case, is
16  that in the Hospira case, and that's -- they are sort of
17  using that as a roadmap and a playbook.  That's their entire
18  argument, is that Amgen made these arguments in a different
19  case, and therefore that is why we win in this case.
20          But to argue that that information is relevant
21  in this case only because it arose in the context of a
22  different case where the information was voluntarily
23  produced, it relates to different patents, different
24  manufacturing -- I mean, the facts are just completely
25  different.

52

1           And so --
2           THE COURT:  I'm not really looking at what
3   happened in the Hospira case.  I'm actually just hung up on
4   why it seems to me it is relevant.
5           MR. GUTMAN:  Yes.
6           THE COURT:  So you produced it.  I guess you
7   thought it was relevant, to some extent.  You've got
8   redactions.  The question is:  Should you be required to
9   unredact those.
10          MR. GUTMAN:  Well, let me address that, Your
11  Honor.  We have not produced information -- I mean, the
12  information regarding these kinds of war game scenarios
13  that I'm referring to for when we might launch is
14  information that we have not produced.  That's the redacted
15  information.
16          THE COURT:  Right.
17          MR. GUTMAN:  And I think as we stated in our
18  letter, courts have generally held this type of information,
19  in fact, more relevant information relating to launch dates
20  as being very commercially sensitive information.
21          THE COURT:  Okay.  I think, right, I read the
22  first case, Judge Bryson's case.  Those were ANDA cases, and
23  they have nothing to do with this.  Right?  That has got to
24  do with the 30-month stay and when you are going to -- let
25  me ask you this actually:  Does discovery in this case, do

53

1   you have a cutoff?  I mean, in other words, at the time the
2   lawsuit is with a filed or at the time that discovery was
3   served, they're not getting your future plan.  This is only
4   historic information.
5           I'm assuming this is historic information we're
6   talking about.  Right?
7           MR. GUTMAN:  Well, when you say --
8           THE COURT:  In ANDA cases they're talking about
9   forward-looking information.  Right?
10          MR. GUTMAN:  Well, the --
11          THE COURT:  Well, just answer that question so I
12  just make sure I'm right because I'm new to this area.
13          MR. GUTMAN:  No, Your Honor.
14          THE COURT:  The cases you cite are dealing with
15  a forward-looking date, and the judge is saying, can I
16  compel a litigant to tell me when they're going to take the
17  risk, if they are, and launch.  Correct?
18          MR. GUTMAN:  Correct, but I think that's
19  precisely the information they are seeking here.
20          THE COURT:  That's why I ask though.  I'm
21  assuming, and maybe I'm wrong, that their discovery request
22  got a deadline, if you will, so that they are only looking
23  at historic information, and these documents, for instance,
24  that are specifically discussed are historic documents.  Am
25  I right?

54

1      MR. GUTMAN:  Well, it's historic in the sense
2  that the documents were generated historically, but the
3  information that they are seeking from us that they want
4  unredacted relates to future-looking activities relating to
5  launch.
6      THE COURT:  But you are saying they're war
7  games.  So it's not like they are going to get from you an
8  admission, or basically a concession or a disclosure is a
9  better word, a disclosure that we're going to launch on this
10  date.  They are not getting that.
11      MR. GUTMAN:  Well, they are.  They would be,
12  because it's not that we will launch on this date, but here
13  are the possibilities.
14      THE COURT:  Well, you said they're war games, so
15  they are not getting it.  These ANDA cases are talking about
16  dates certain when they are going to launch.  Right?  Courts
17  are doing it to figure out if they have to do a preliminary
18  injunction or anything like that.  Correct?
19      MR. GUTMAN:  I think that's one of the reasons.
20  I think it goes beyond that, Your Honor.  I think one of the
21  reasons why those cases, in those cases the courts have held
22  that there's no authority to compel production of that
23  information is also given the commercially sensitive nature
24  of the information, and so one of the reasons why the
25  plaintiffs are seeking that information here, I think they

55

1  are trying to relate it to safe harbor.
2      I don't think that it is relevant to the safe
3  harbor issue particularly when you think about all of the
4  information that really is much more directly relevant to
5  the safe harbor issue that they have.  And what they are
6  really looking for --
7      THE COURT:  Would you agree that if there was a
8  document that is a year old from Amgen in which Amgen said,
9  we're going to make X, you know, amount of the product so
10  that we can sell it and you had a date certain you're going
11  to sell it by, you would admit that's relevant, wouldn't
12  you, under the safe harbor defense, wouldn't you?
13      MR. GUTMAN:  And we are producing information
14  just like that, Your Honor.
15      THE COURT:  Okay.  All right.
16      MR. GUTMAN:  So if the information is, here's
17  why we're manufacturing, or here is what we're going to do
18  with what we've manufactured -- I mean, this is a very, I
19  think, nuanced factual issue, and it's a distinction that is
20  nuanced, but very, very significant.
21      We are producing information that bears on why
22  we manufactured this product, so if there's a document
23  somewhere that says, we manufactured this in order to be
24  able to release this material into the market, or if there's
25  a document that says, we manufactured this lot because we

56

1  want to commercially stockpile to prepare for our launch
2  whenever it is, we are producing that.
3      So they have -- that's what I was referring to
4  before, and it's difficult to articulate, you know, that
5  category of documents, but we are producing documents that
6  bear directly on the issues of why we manufacture, what
7  we're going to do with the product.
8      Plaintiffs have even asked us for the location
9  of the product, you know, the address, how much is being
10  stockpiled, all kinds of information.  We're giving them all
11  of the information that bears directly on the safe harbor
12  issue.
13      THE COURT:  Okay.
14      MR. GUTMAN:  This category of information that
15  is directed very narrowly to, you know, what are your, you
16  know, possible plans about launching is much more afield of
17  all of that information that they've already had that we're
18  not -- you know, we are not trying to -- we are not trying
19  to keep from producing that information.
20      And --
21      THE COURT:  Go ahead.  I do want to watch the
22  time.
23      MR. GUTMAN:  Yes, Your Honor.  Just one last
24  point.
25      THE COURT:  Sure.

57

1      MR. GUTMAN:  All of this information regarding
2  potential launch scenarios not only is irrelevant to the
3  issue of safe harbor, but all of that has been informed by
4  counsel because those discussions are driven by issues
5  relating to the plaintiffs' patent landscape, what our
6  freedom to operate positions are with respect to those
7  patents, and that informs the possible timing of when we
8  might launch into the market, and so all of these scenarios
9  are informed by that advice of counsel.
10      THE COURT:  But that's not the test, right, to
11  see if something is privileged, whether it has been
12  informed, especially when it comes to factual disclosures.
13  Right?
14      MR. GUTMAN:  Well, when Amgen may launch into
15  the market is a conclusion that is derived from Amgen's
16  legal department, and that was, that was something that was
17  testified to explicitly by Ms. Elson, you know, where she
18  said very specifically in her testimony that is the ultimate
19  decision about when to launch is a decision made by the
20  legal department based on an assessment of the legal issues
21  and the legal landscape, the progress of this case, among
22  other considerations that inform that decision.
23      THE COURT:  That seems like a very broad
24  assertion, the attorney/client privilege.
25      Do you have anything else?

58

1    MR. GUTMAN: No, Your Honor.

2    THE COURT: Thank you.

3    MR. GUTMAN: Thank you.

4    THE COURT: Mr. Gaffney, do you want to add

5    anything?

6    MR. GAFFNEY: If there are any particular issues

7    Your Honor would like to have me address, I'm happy to.

8    THE COURT: I wouldn't mind hearing you state

9    just for the record the relevance in your own words.

10   MR. GAFFNEY: Sure. It's relevant on our

11   damages claim, what you'll hear us refer to as our 272(a)

12   claim. That is the claim for infringement by pre-launch

13   manufacturing for which we seek damages.

14   THE COURT: All right.

15   MR. GAFFNEY: So I think, Your Honor, it's

16   relevant to liability, and it's certainly relevant to the

17   damages.

18   THE COURT: And that's where safe harbor defense

19   is implicated?

20   MR. GAFFNEY: Exactly. It's a safe harbor

21   issue.

22   THE COURT: So I'm going to find that, I'm

23   going to grant Genentech's motion in this respect to compel the

24   production of Exhibit 7 to 11 of the plaintiffs'

25   October 5th, 2018 letter with redactions for defendants'

59

1    launch plans for the Mvasi removed. Actually, I'm just

2    going to start over because I want to have the record just

3    be clear.

4    Can you produce the unredacted documents in

5    question within seven days?

6    MR. GUTMAN: With respect to those exhibits,

7    Your Honor, I think that's possible, yes.

8    THE COURT: Okay. So that I'm going to order

9    you within seven days of today to produce copies of Exhibit

10   7 through 11 to plaintiffs' October 5th, 2018 letter with

11   redactions for defendants' launch plans for Mvasi removed.

12   And also within seven days, you shall remove redactions for

13   your launch plans from Mvasi from other previous documents

14   except where legal advice is being sought, provided, or

15   communicated.

16   And for the latter, what is the deadline you

17   could comply?

18   MR. GUTMAN: Your Honor, it's difficult to say

19   because I'm not -- standing here today, I can't say that I

20   know exactly what that volume of documents is, so it's

21   difficult for me to assess whether we could do that in a

22   week or some finite period of time.

23   If we could have an opportunity to go back and

24   look at those documents and then we can discuss the issue of

25   the timing of producing unredacted versions of those with

60

1    plaintiff.

2    THE COURT: Okay. Mr. Gaffney?

3    MR. GAFFNEY: 30 days is fine, Your Honor. We

4    have looked at this issue, and I think the selection I gave

5    you, provided to the Court was out of about 40 documents

6    where we found similar redactions, so I don't think the

7    volume is, at least as currently produced is massive, but

8    if 30, it's fine. As far as we can tell, none of this is

9    the traditional legal advice conveyed or sought, what have

10   you.

11   THE COURT: Right. Let's be clear. So even

12   with the documents 7 through 11, if in that document there

13   is legal advice being sought, provided or communicated, then

14   I will hear an application to keep it redacted, but not

15   because -- what I will not entertain is just this broad

16   assertion that some statement was informed by counsel.

17   Some nebulous standard like that is clearly not what the law

18   is.

19   All right. So let's do this then. Do you think

20   30 days?

21   MR. GUTMAN: Well, I actually have a suggestion,

22   Your Honor. It might make sense. Plaintiffs obviously know

23   what documents they want produced. If plaintiffs could

24   produce to us a list of the documents that they want

25   produced and then we can take a look at that list and we can

61

1    have a discussion about how long it would take to unredact

2    them, or if we're taking positions with respect to privilege

3    with respect to a certain document. But I think it makes

4    sense for plaintiffs to start the discussion with us by

5    identifying the documents that they are seeking to be

6    produced unredacted.

7    MR. GAFFNEY: That's fine, Your Honor.

8    THE COURT: Okay. So, and, Mr. Gaffney --

9    MR. GAFFNEY: Yes?

10   THE COURT: -- do you want the first five

11   exhibits within seven days?

12   MR. GAFFNEY: I do.

13   THE COURT: All right. So then on this topic,

14   let's start a clean slate, and here's what we're going to

15   do.

16   Within seven days the defendant shall produce

17   copies of Exhibit 7 through 11.

18   We know what we're talking about. Correct,

19   Mr. Gutman?

20   MR. GUTMAN: The exhibits? Yes, Your Honor.

21   THE COURT: All right.

22   MR. GUTMAN: The exhibits attached.

23   THE COURT: Attached to the October letter that

24   they filed. Correct?

25   MR. GUTMAN: Yes, Your Honor.

62

1    THE COURT:  All right.  So you'll produce those
2  documents.  If there are in the document statements where
3  legal advice is sought, provided or communicated, you can
4  redact those.
5    And then within 30 days -- well, Mr. Gaffney,
6  you will produce the 40 or so documents to the defendants by
7  when?
8    MR. GAFFNEY:  The end of the week.
9    THE COURT:  End of the week.  And then you have
10  30 days, Mr. Gutman, from that date to return the documents
11  in question in unredacted form, again except where you have
12  a legitimate basis to assert the attorney/client privilege,
13  which would mean that there would be documents where in
14  legal advice was sought, provided, or communicated.  All
15  right?
16    MR. GAFFNEY:  Thank you, Your Honor.
17    MR. GUTMAN:  Yes, Your Honor.
18    THE COURT:  Thank you.
19    All right.  Now, that dispenses with Genentech's
20  I believe, letter.  Correct?
21    MR. GAFFNEY:  It does, Your Honor.
22    THE COURT:  So, all right.  Amgen then.  Would
23  you like to be heard on your letter, please?
24    MR. GUTMAN:  Yes, Your Honor.  So, Your Honor,
25  the first issue in our letter is the issue of plaintiffs'

63

1  violation of the scheduling order.
2    Just by way of background, and I think that
3  plaintiffs agree with us because they allude to it in their
4  own correspondence to the Court, that we spent a very long
5  time talking about the issues in that scheduling order.
6    Judge Sleet generously gave us two full days of
7  scheduling conferences.  There were just innumerable number
8  of hours that counsel discussed the various issues that were
9  memorialized in the scheduling order.  There was a lot of
10  blood, sweat and tears that went into that scheduling order,
11  and the result of that effort was that plaintiffs were
12  required to identify no more than 20 claims by
13  September 17th.  And to our surprise, on September 17th,
14  they sent us a letter identifying not 20 claims, but 37
15  claims.
16    They didn't take any effort to seek relief from
17  the order.  They could have filed a motion under Rule 60.
18  They could have sought to compel discovery that they
19  continued to tout as being deficient.
20    They took no action whatsoever before the
21  deadline in the scheduling order to try to bring these
22  issues, these discovery issues that are unsupported by
23  nothing more than attorney argument to the Court's
24  attention.  They just ignored the Court's scheduling order
25  and said, we believe we're justified in identifying as many

64

1  claims as we feel like.
2    And setting aside the merits of their discovery
3  disputes, and it's meritless in our opinion, and I think
4  that I can explain why it's not a credible position for them
5  to take, but it's almost beside the point.  The point really
6  is, there was an express order from this Court.  They didn't
7  do anything to seek relief from the order.  The order itself
8  provided a mechanism of relief if they felt that for good
9  cause the scope of the scheduling order needed to be
10  expanded.
11    The specific --
12    THE COURT:  I will tell you what on that.
13    MR. GUTMAN:  Oh.
14    THE COURT:  I hear you and I'm very much a
15  stickler for play by the rules.  Let's move on though.  I
16  will hear -- I'm sorry.  Who is going to article that?
17    MR. BERL:  Mr. Berl.
18    THE COURT:  Mr. Berl?
19    MR. BERL:  Yes.
20    THE COURT:  And incidentally, I am empathetic,
21  I'm empathetic to having an adversary not follow the rules.
22  I'm not saying incidentally that Genentech did not follow
23  the rules, but I hear you.  I don't know that it's going to
24  further the cause to keep on going.  Let's move on to the
25  merits.

65

1    MR. GUTMAN:  Okay.  The point is, there were
2  mechanisms that they could have utilized in order to
3  address this issue before the deadline in the scheduling
4  order.
5    THE COURT:  Right.  So let me help you focus to
6  my benefit.  I'm a little uncomfortable with limiting the
7  plaintiff to 20 claims at this point.  I do think we have to
8  manage the case, but I think it's hard to get down to that
9  number of claims this soon.  And so I will just tell you
10  right now, I am inclined to expand the number of claims.
11  I'm not saying it's 37.  And, incidentally, I also do want
12  to make it clear to plaintiff, because they have mentioned a
13  number of times it seems in the record about the due process
14  rights, which they should be acknowledged.
15    If there ever came a point after I had set for
16  case management purposes that we would limit the number of
17  patents or claims, and I will also be open to the
18  plaintiffs, if they didn't think their due process rights
19  were served because patents or claims were not in the case,
20  to raise that at a later date.  But what I need to
21  ultimately be mindful of is how to manage this case.
22    So I'm inclined to keep the Markman date or at
23  least be close to it.  So the question is:  How do we get
24  there, reducing the claims, because I know these lawyers are
25  good lawyers.  They are not going to want to try a case to a

66

1  jury with all of these patents or claims. Right? So I know
2  they are going to want to reduce it, too.
3          So tell me with that in mind, right, and we've
4  got 16 or 18 claims that they've got. And the question is:
5  They can't reduce it. They want to limit themselves to two
6  more. Is that right?
7          MR. GUTMAN: I think that's a bit of a red
8  herring.
9          THE COURT: Okay.
10         MR. GUTMAN: To be honest, Your Honor.
11         THE COURT: I will let you talk then. You know
12  where I'm coming from.
13         MR. GUTMAN: Yes.
14         THE COURT: Address the issue. What do we do to
15  resolve it?
16         MR. GUTMAN: First of all, the parties and Judge
17  Sleet and everyone was a party to the scheduling order
18  believed that 20 claims was a reasonable number.
19         THE COURT: Yes. You know, that, I've read the
20  transcript, and I don't think that's an accurate -- an
21  accord was reached, but it's my case now, and I applaud the
22  effort that was made to try to achieve a workable case
23  management schedule and procedures and policies, and believe
24  me, we're not going to get more than 37 claims. I'm there.
25  So help me just going forward.

67

1          MR. GUTMAN: Yes.
2          THE COURT: What should we do?
3          MR. GUTMAN: Well, first of all, I will point
4  out to the Court that the number 20 was not ordered by the
5  Court. It was stipulated to by plaintiffs, and so we had a
6  meet and confer where we were discussing what would be the
7  number of claims that the plaintiffs would select, and they
8  stipulated to 20. So this isn't a situation where there was
9  a dispute and the Court said, okay. I'm going to decide
10  that it's 20 claims.
11         THE COURT: Okay.
12         MR. GUTMAN: They agreed to it.
13         THE COURT: Fair enough, but I'm open to the
14  possibility of more than 20.
15         MR. GUTMAN: Okay.
16         THE COURT: So no more than 37 for sure. What
17  do you think? What should we do?
18         MR. GUTMAN: Again, the problem with --
19         THE COURT: Again, I want to hear Mr. Berl
20  explain why no application for relief. I'm hearing you on
21  that, okay, but assuming he has got a good explanation,
22  we'll take care of that. Let's deal with going forward.
23         MR. GUTMAN: Okay. One of the complications
24  with all of this, particularly with adhering to the claim
25  construction hearing date, is that the expansion of the

68

1  number of claims is essentially creating a shell game on
2  claim construction.
3          Now, I know that plaintiffs are arguing that,
4  oh, it's not a problem. The same terms that would be in
5  dispute with 20 would be in dispute with 37. But that's
6  just not the case, Your Honor. If you look at -- wait a
7  minute.
8          If you look at plaintiffs' letter dated
9  October 9th, there's an appendix of the claims in the two
10  patents.
11         THE COURT: All right.
12         MR. GUTMAN: And so they are saying that --
13  their argument is 37 equals 20. It won't enlarge the scope
14  of the claim construction proceedings, but that is false.
15  And just by way of example, Your Honor, if you look at page
16  A1 of plaintiffs' appendix and you go to claim 2, the
17  Carvalhal patent, it talks about where the claim further
18  comprises a plant peptone, a porcine peptone, or both a
19  plant peptone and a porcine peptone. Okay.
20         What does it mean to be a peptone? What does it
21  mean to be an porcine peptone? That's a term that could
22  enlarge the scope of claim construction.
23         Let's go to another claim. Another claim is
24  claim 41. It's a method of culturing a Chinese hamster
25  ovary cell comprising a nucleic acid, including a

69

1  fragment thereof, method of comprising contacting the CHO
2  cell.
3          Well, what's a CHO sell? It is a chinese
4  hamster ovary cell comprising copper insulin and cystine?
5  What is cystine?
6          These are all terms that are additive in the
7  context of claim construction. So the more claims there
8  are -- and they are pointing to dependent claims in each of
9  these patents, right. They are not saying, oh, it's 37, you
10  know, independent claims that essentially say the same
11  thing. They've added many, many, many, many dependent
12  claims.
13         THE COURT: I agree. I get that. Okay. But
14  help me out because I'm looking for help here.
15         MR. GUTMAN: Right.
16         THE COURT: I read some transcript from the
17  Northern District of California where the judge said, I'm
18  only doing ten terms. I'm not there. I am learning. I'm a
19  new judge. I've only tried two patent cases myself. You
20  know, local counsel for a bunch. But I'm looking to be
21  educated and to help the parties get a fair litigation.
22         So I know it's impossible for me to have a
23  Markman hearing where we're looking at 37 claims. All
24  right. I don't know what's possible. Maybe it's ten.
25  Maybe we follow the Northern District of California. I

70

1  agree that by adding claims, they're going to add potential
2  terms.  But can you propose some mechanism for us to let
3  them add it now until they're in a position to be more
4  informed, and I am, I will say, I'm persuaded that they need
5  some more information before they pick some of these
6  dependent claims.  I get that, and we'll deal with that
7  later.
8        But my question would be is:  Do you have a
9  calendar proposal where you can say, okay.  We'll start with
10  33 and then we'll narrow it on such and such a date.  And
11  then by the time we get to Markman briefing, we'll limit it
12  to something else.  I'm receptive to hearing that.  I agree,
13  you can't be burdened by having to go into a Markman hearing
14  with 37 claims, but the Court can't either.
15        So could you maybe suggest a way to get there
16  that something in between that 20 claims by September 17th,
17  which has already passed, and a Markman hearing.  If you
18  want a time, I get that, too.
19        MR. GUTMAN:  Yes.  I would need to give that
20  some thought, Your Honor, because frankly, the scheduling
21  order has been in place for a long time, and so, you know,
22  from our standpoint, you know, we've been contemplating 20
23  claims all along, particularly given that they stipulated.
24        THE COURT:  Well, when was the 20 claims set?
25        MR. GUTMAN:  It was set before the scheduling

71

1  order was actually entered.
2        THE COURT:  Okay.  Do you know when it was?
3  When?
4        MR. GUTMAN:  The scheduling order was entered in
5  May of this year.
6        THE COURT:  Okay.
7        MR. GUTMAN:  And so we were having discussions
8  in April and even before that.
9        THE COURT:  Right.
10        MR. GUTMAN:  In the context of scheduling
11  conferences.  I believe they stipulated to the number of
12  claims that we would proceed on for purposes of claim
13  construction and trial.  I think it was in April.
14        So, you know, we've been operating under the
15  scheduling order with discovery and everything for at least
16  the last six months when they stipulated to this number.
17  And so we've been engaged in, you know, claim construction
18  analyses that are predicated on that agreement and the
19  order.
20        And so one of the things that was very
21  important, and this is why the parties spent so much time
22  with the scheduling order, is that we tried to create a
23  balance between what the parties, what plaintiffs purported
24  to need in the way of discovery and Amgen's, you know,
25  interest and the public interest in trying to facilitate our

72

1  entry into the market as soon as possible, and the
2  scheduling order is really the product of balancing those
3  interests.
4        THE COURT:  Okay.  So I hear you then.  I feel
5  bad for both parties, that they had one judge and it gets
6  changed to another judge, and I use different procedures.  I
7  mean, I feel sorry for all of the litigants in the cases
8  that have been transferred to me, and you have to understand
9  there's a lot of cases in this court.  It's overwhelming.
10  We have to balance the judicial resources, too.
11        Let's get concrete.  They are saying that they
12  need the samples or they need to know more about the
13  chemical question.  How do you pronounce it?
14        MR. GUTMAN:  There are two different chemicals.
15  There's cystine and cysteine.
16        THE COURT:  So cystine, and then how do you
17  pronounce the other one?
18        MR. GUTMAN:  Cysteine.
19        THE COURT:  All right.  Now, if they had that
20  information, right, then maybe we could force them to reduce
21  the extra claims they want down to something like 20
22  overall, so it would be like two.
23        How can we facilitate that?
24        MR. GUTMAN:  Well, let me address that, Your
25  Honor, because that I think is a really important point.

73

1        They are arguing that they need certain
2  discovery.  We don't agree with that.  We don't agree
3  that -- we think they've had all of the discovery they
4  need.
5        THE COURT:  Again, just looking, I barely had
6  time to, you know, digest this case.  But when I look at the
7  claims, for instance, about cystine concentration, there are
8  very, very specific numbers here.  So isn't it fair that
9  they ought to be able to have that information, what is the
10  concentration that you use?
11        MR. GUTMAN:  And so we have been telling them
12  for 18 months, Your Honor, actually more than that, almost
13  two years, that they have the information, and we've
14  explained why they have the information.
15        THE COURT:  You are saying they actually have
16  your concentration level?
17        MR. GUTMAN:  They do, Your Honor.  And the
18  reason why I say that, and this is something we told them
19  about almost two years ago, that based on the information
20  that is disclosed in Amgen's BLA, they know what our
21  concentrations are, what the relevant concentrations are.
22        And, in fact, and I know Your Honor doesn't like
23  to refer to other cases, but in this --
24        THE COURT:  No.  Go ahead.
25        MR. GUTMAN:  -- on this particular issue, I

74

1  think it's relevant, that Genentech has another action
2  against Amgen regarding a different product that is also
3  before Your Honor, and --
4          THE COURT:  And you're seeking to judicially
5  estop them?
6          MR. GUTMAN:  No, no, no, no.  I am actually not,
7  Your Honor.  They can argue whatever they want.  But in that
8  case, based on less information than what we provided in
9  this case, Genentech has taken the position that they can
10  limit to two claims in the very same patent, the very same
11  patent.
12         THE COURT:  No.
13         MR. GUTMAN:  And the reason, Your Honor, is
14  because they know that the information that is disclosed in
15  the BLA allows them to calculate what the concentration is.
16  They're not seeking samples or anything else in that other
17  case.  And the reason is because they already have the
18  information.  And this is really, there is no record
19  developed on this issue, but they are arguing through
20  attorney argument that they need samples in order to
21  determine what the concentration is.
22         What we've told them is, you have the
23  information.  You can calculate the concentrations.  You
24  know what the concentrations are.  And they've asked our
25  witness, you know, they misleadingly quote Ms. Nack's

75

1  deposition testimony and say, Ms. Nack couldn't provide the
2  concentration.
3          Well, it's because Amgen doesn't keep track of
4  what that concentration is, but it's calculable.  It's
5  calculable, and it's something that through expert
6  testimony, they can establish.  They don't need anything
7  else.  And I think the fact that they're not pursuing this
8  discovery in the other case calls into question the
9  credibility of their argument, which really is just attorney
10  argument.  There is no foundation, there is no record before
11  the Court for their suggestion that they cannot determine
12  the concentration of these recited ingredients based on the
13  information that we've already disclosed to them.
14         Now, so why are they making this argument?  For
15  sport?  No.  One of the reasons why they are making the
16  argument, and we alluded to this.  You know, we quoted a
17  hearing in our correspondence where we predicted that they
18  want to try to blow up the schedule.  That, you know, we
19  will always have discovery issues.  There will never be
20  enough discovery because by raising these discovery issues,
21  even though they're baseless, even though they have no
22  record evidence that supports anything that they are saying,
23  they will always wave the flag of a discovery dispute to try
24  to alter the schedule.  And that is something that was very
25  important to Amgen in negotiating what the scheduling order

76

1  would look like.  It was that balance between giving them
2  the discovery they need and having dates set that would
3  facilitate the soonest possible entry into the market for
4  Amgen.
5          And --
6          THE COURT:  I'm sensitive to that.  That's why I
7  said I'm going to do my best to keep the Markman around the
8  same time.  I hear you on that.
9          MR. GUTMAN:  But this issue about needing
10  additional discovery in order to -- I mean, first of all,
11  they had 20 claims, Your Honor, that they could have
12  allocated any way they had.  For them to say, we're
13  allocating 18 to 6 patents and then we couldn't, we couldn't
14  just allocate two to the rest, and so we added on, you know,
15  19 claims in addition to the 18 -- they could have very well
16  taken more claims that they had allocated to other patents
17  and put them, and identified more claims on the two patents
18  that they're more concerned about.
19         Now, what you are not hearing from plaintiffs,
20  Your Honor, and this is a very important point.
21         THE COURT:  Do it quickly though.
22         MR. GUTMAN:  Yes.  They are not arguing, Your
23  Honor, that they don't have enough discovery.  Even if they
24  think that there's discovery that's missing, they are not
25  arguing that they don't have enough discovery to be able to

77

1  make this claim selection.
2          THE COURT:  Okay.
3          MR. GUTMAN:  They are arguing, we want every
4  scrap of information that may bear on this issue even though
5  they don't need it in order to be able to make the
6  selection.
7          So fact discovery is going on through July.  You
8  know, if there's additional discovery that they want, we can
9  address that.  There's no reason why they need this
10  discovery.  They have not come forward with any evidence for
11  it.
12         THE COURT:  Okay.
13         MR. GUTMAN:  Before they made their claim
14  selection, Your Honor.
15         THE COURT:  All right.  Thank you, Mr. Gutman.
16         Mr. Berl.  So, look, Partly, the beneficiary, I
17  don't have a lot today.  I do have another hearing later
18  this afternoon, so I am taking the time.
19         Are you all able to stay for a little bit,
20  because I wanted to talk about some case management issues.
21  All right.
22         But having said that, I want to pick up the
23  pace, and if everybody could shorten their arguments to just
24  hit the most salient points.
25         Mr. Berl?

78

1          MR. BERL:  I will try, Your Honor.  David Berl
2   for Genentech.  I've been accused of all sorts of
3   malfeasance in the last 15 minutes, including trying
4   violating the protective order, trying to blow up the
5   schedule, and not arguing various things.
6          Let me be clear with respect to the scheduling
7   order.  That scheduling order has to be viewed in context.
8   It didn't arise from nothing.
9          THE COURT:  You don't have to persuade me.  I
10  read the transcripts.
11         MR. BERL:  Okay.
12         THE COURT:  The question is:  Why didn't you
13  seek applications?  Why didn't you seek relief?  It's a
14  Court Order.  Explain that.
15         MR. BERL:  Yes.  I'm happy to, Your Honor.  That
16  Court Order was entered in May.  We asked for discovery.
17  Judge Sleet said we were entitled to the discovery.  We
18  served a 30(b)(6) notice.  They objected.  We had a hearing
19  in front of Judge Sleet.
20         In July we had a hearing in front of Judge Sleet
21  at which he agreed with us, as he had throughout the whole
22  time, that this claim narrowing was subject to our obtaining
23  adequate discovery to make intelligent decisions about which
24  claims to choose.
25         That happened after the scheduling order.  That

79

1   was a hearing from late July.  We then had further disputes
2   with Judge Sleet, the last of which --
3          THE COURT:  I hope you didn't have disputes with
4   Judge Sleet.
5          MR. BERL:  Sorry.  Before Judge Sleet.  I
6   apologize, Your Honor.
7          And the last one resulted in an order, and I'm
8   quoting from memory, which ended with a line something to
9   the effect of, the Court itself is a limited resource and
10  the parties have essentially exhausted that resource.
11         Judge Sleet made it clear what he thought about
12  the scheduling order, that we did not have to narrow until
13  and unless we obtained adequate discovery, and he likewise
14  made clear that he didn't want to hear from us on issues
15  that we should be able to work out ourselves.  And this is
16  such an issue, I would submit.
17         THE COURT:  Okay.  So let's just establish
18  ground rules for me.  I don't have a procedure that you have
19  to seek permission before filing something.  However, I will
20  say, and this applies to both sides, and my understanding is
21  it's non-Delaware counsel.  I don't know if that is true.
22  So don't engage in conversations with my deputy clerk and my
23  case manager about the merits or anything like that.  If you
24  want to call to get a date pursuant to the scheduling
25  procedure or discovery dispute procedures I have, that's

80

1   fine.  That should be a real short, can you give me some
2   dates, we need to tee up some issues.
3          Now, I understand comments were made from
4   both sides about how often I'm going to see you and that
5   kind of thing.  You're all very nice folks, but just because
6   we have a discovery process, I would hope that both sides
7   will be circumspect in using it because I might get to the
8   point, like some other judges have historically here, of
9   limiting then the contact that particular litigants can
10  have with the Court.  I'm hoping we don't have to do that.
11  All right.
12         All of that said, again, for both sides, but in
13  fairness, because I hear Mr. Gutman, and I hear the position
14  you were in, but once we do enter any orders in this case,
15  if you decide just to violate it, the terms without first
16  seeking Court relief, that would be a real, real problem.
17  Okay.
18         So I think we dealt enough with the issue now of
19  that.  Now help me get to, what are we going to do going
20  forward.
21         MR. BERL:  And I'm happy --
22         THE COURT:  If you would address first the need
23  for the information you need in order to further narrow the
24  claims.
25         MR. BERL:  I would be happy to start there, Your

81

1   Honor.
2          THE COURT:  All right.
3          MR. BERL:  As Your Honor observed, these two
4   patents have claims directed to specific concentrations of
5   particular chemicals.  One of them is the Carvalhal patent
6   which addresses cysteine and cystine.  The other is the
7   Gawlitzek patent which addresses glutamine and asparagine.
8          We sought discovery of how much of these
9   chemicals Amgen has in its manufacturing process, and
10  honestly, it's remarkable to hear that Amgen has we have
11  the information we need, because I know.  I was there.
12         I asked this witness question after question.  I
13  will take one example.  It's page 195 of her deposition.
14  She said we don't measure this.  I said, I know you don't
15  measure this.  I'm trying to understand if you know how much
16  of these chemicals is in there.
17         And my question is:  "Does Amgen have any
18  understanding of the concentration of cystine in its cell
19  culture media at any time during its manufacture of ABP 215,
20  that's their product, despite the fact that Amgen doesn't
21  measure it?
22         "Answer:  No."
23         Answer again:  "No, Amgen does not."
24         We asked them again time after time, do you know
25  how much is in there?  Their answer over and over again was,

82

1   we don't have the first clue.  We have no idea.
2          THE COURT:  So how do we address that?
3          MR. BERL:  So Mr. Gutman says we have the
4   information and we can calculate it.  Their witness actually
5   disagreed with that too.  She said it depends on all sorts
6   of things and she can't calculate it.
7          THE COURT:  What do you do?
8          MR. BERL:  What we do is, we need the sample.
9   That's the only way to get this information, and we've known
10  that from April of last year, when we said to them, we see
11  from your documents, you have a manufacturing run coming up.
12  We think you're going to take samples as most companies do
13  every single day.  Save some for us.  Give us some.
14      They said no.  They said, pound sand.
15          We exchanged letters and we didn't include them
16  because we didn't want to burden the Court, but I'm happy to
17  give them to Your Honor where they basically said, sum and
18  substance, no.
19          THE COURT:  Is there a specific discovery
20  request that has been propounded for date that would call
21  for the production of samples?
22          MR. BERL:  Yes.  Several.  I don't have the
23  number.
24          THE COURT:  Are they identified in a letter?  It
25  could be.

83

1          MR. BERL:  I'm not sure that we identified that.
2   I would be happy to do that.  I assume within a matter of
3   minutes I will have those numbers.
4          I know we have specific letters that are in
5   front of me.
6          THE COURT:  Yes, but a letter is different.  Are
7   there outstanding discovery requests that call for the
8   production of samples?
9          MR. BERL:  Yes, there are discovery requests,
10  and within a few minutes I'm sure I can point Your Honor to
11  them.
12          Document request 54.
13          THE COURT:  All right.  So they did it -- hold
14  on one second.
15          Yes.  So you're responding, so that might be
16  why.
17          MR. BERL:  Yes.
18          THE COURT:  You've not filed a motion to
19  affirmatively obtain this discovery yet.  Okay.  All
20  right.
21          Do you want to hand it up?  Wait.  You only have
22  one copy?
23          MR. BERL:  That's fine.  I'm sure we have
24  others.
25          MR. GAFFNEY:  We have an extra.

84

1          (Mr. Berl handed documents to the Court.)
2          THE COURT:  Mr. Berl, what were you directing my
3   attention to?  What number?
4          MR. BERL:  Document request 54, Your Honor.
5          THE COURT:  That seems pretty specific to me.
6   It's calling for production of a sample of a specific volume
7   of measurement levels of, among other things, cysteine,
8   cystine, glutamine and asparagine, of all samples drawn from
9   Amgen's reactor during the manufacturing of ABP 215 drug
10  substance.
11          Okay.  All right.  You can have a seat, for a
12  second.
13          Mr. Gutman, can I ask you, what has been Amgen's
14  response to request number 54?  Has it included the
15  production of samples?
16          MR. GUTMAN:  Well, so the --
17          THE COURT:  That's a real easy question.  I will
18  let you explain all you want, but it's just a yes or no to
19  start.
20          MR. GUTMAN:  Yes.  I think we objected.  I don't
21  have the response in front of me, Your Honor.
22          THE COURT:  So you have not produced it.  You
23  agree with that?
24          MR. GUTMAN:  We have not produced the samples.
25          THE COURT:  Okay.

85

1          MR. GUTMAN:  Yes, that's correct.
2          THE COURT:  You've filed some kind of objection.
3   In fairness to you, I get that.  You don't know.
4          MR. GUTMAN:  Yes.  So what Mr. Berl just argued,
5   he's confusing two different issues when he cites to the
6   deposition testimony that he cites.
7          THE COURT:  Look --
8          MR. GUTMAN:  Okay.
9          THE COURT:  I've actually moved on because
10  there's a discovery request, and I understand from
11  Genentech, if they obtained samples -- actually, Mr.
12  Berl, do you mind.  Let me just ask you:  If you obtained
13  samples, would you be able to narrow the number of claims
14  from 37 down to something much closer to 20?
15          MR. BERL:  Yes, with a footnote.
16          THE COURT:  Okay.
17          MR. BERL:  And the footnote is, there's a little
18  complication here because cystine and cysteine exist in
19  something called an equilibrium.  Sometimes you have more
20  cystine, sometimes you have more cysteine, depending on the
21  conditions of the bioreactor.
22          And so the samples have to be preserved in a way
23  that preserves their concentration of cystine and cysteine.
24  If the samples are properly preserved, the answer to your
25  question is yes.

86

1    MR. GUTMAN: And, Your Honor --

2    MR. BERL: We have offered on a confidential

3 basis to Amgen our protocol for preserving the

4 concentrations of cysteine and cystine so that they can

5 preserve it properly.

6    MR. GUTMAN: Your Honor, this really is the

7 issue. There will always be a footnote. There will never

8 be a time.

9    THE COURT: Okay, but, look. He stated in

10 court, this is -- we would all do much better to limit our

11 references to other cases and to other patterns of behavior

12 and examples. Just limit it to -- Mr. Berl has just

13 represented there is a footnote, but it's a very narrow

14 footnote, and it can be satisfied by protocols that you

15 might have reached. So it's not helpful to say, will there

16 be another footnote. He has only said one footnote. I'm

17 focusing on on that.

18    MR. GUTMAN: I understand, Your Honor.

19    THE COURT: Okay.

20    MR. GUTMAN: So going back to the specific

21 requests, we objected. We objected based on a number of

22 different, for a number of different reasons, one of which

23 is, they already have the information.

24    THE COURT: Okay. They say they don't. You

25 have not produced it. You have not produced samples. You

87

1 told me that.

2    MR. GUTMAN: We have not produced samples, but

3 the burden in producing the samples is it's overly

4 burdensome, particularly in view of the fact that they

5 already have the information they need to be able to

6 calculate the concentration.

7    THE COURT: Help me out on that. How is that

8 burdensome to produce a sample?

9    MR. GUTMAN: Well, one of the reasons why it's

10 burdensome, and there's testimony on this, Your Honor, from

11 the Nack deposition testimony. And this actually is

12 precisely the reason why they should have come to the Court

13 and formally requested relief, is because as Ms. Nack

14 testified, it's not -- you don't stick a turkey baster into

15 the bioreactor and just pull out a sample. It's a very,

16 very involved process.

17    Amgen, by the way, is not manufacturing this

18 material every day. There are only specific periods of time

19 that are tied into FDA regulatory needs where Amgen is

20 manufacturing the material.

21    Now, once the manufacturing has taken place,

22 it's not, you know, turning a dial, sticking in the turkey

23 baster and taking it out. And there's extensive testimony

24 from Ms. Nack in her 30(b)(6) testimony where plaintiffs

25 wanted to try to paint the picture that it was exactly

88

1 that. Stick a turkey baster in, send the sample to the

2 freezer.

3    THE COURT: So just help me out. Help me

4 understand. What is the burden? I get it more than

5 sticking a turkey baster in. I'm trying to understand,

6 and I also get that you're not manufacturing on a daily

7 basis. Help me understand what it would entail to take a

8 sample.

9    MR. GUTMAN: Well, what it would entail is, and

10 I don't have the deposition testimony in front of me, Your

11 Honor, so, again, this is by recollection, but, you know, it

12 requires generating a lot of documentation because these are

13 FDA regulatory -- regulated processes. We can't just do a

14 run and, you know, and take a sample.

15    So there needs to be certain documentation that

16 is generated in order to validate the request, validate the

17 reason. It has got to work its way through, you know, the

18 technical aspects of doing the run. And so it's not just as

19 simple as a decision is made and then the sample is taken.

20 There has to be -- there's an FDA mandated process that has

21 to take into account a deviation in the way that you're

22 manufacturing the material. So that's sort of the prelude

23 to actually getting a sample. So there are internal

24 documentation processes that need to take place, and it

25 requires a team of people. You are essentially modifying

89

1 the manufacturing process for that material.

2    THE COURT: Okay.

3    MR. GUTMAN: And now --

4    THE COURT: So go back to the deposition that

5 Mr. Berl quoted from. That was a 30(b)(6) witness of yours.

6 Correct?

7    MR. GUTMAN: Yes, Your Honor.

8    THE COURT: It sounds like she doesn't know what

9 the concentration levels are. Correct?

10    MR. GUTMAN: Again --

11    THE COURT: That's a pretty easy answer. Right?

12 It seems yes or no. The transcript seems pretty explicit,

13 she doesn't know.

14    MR. GUTMAN: She doesn't know what the

15 concentration is. I think what's important to appreciate,

16 Your Honor, is she did not say you couldn't calculate the

17 concentration.

18    THE COURT: You keep coming back to that. I get

19 it.

20    MR. GUTMAN: Okay.

21    THE COURT: And then I'm in the realm of experts

22 debating. You can see why it would be more probative to

23 know what the actual concentration is as opposed to experts

24 fighting over what they think the concentration should be.

25 Right?

90

1      MR. GUTMAN: Well, this may become an issue

2  during claim construction, Your Honor, but we don't think

3  that the claims -- you know, they're arguing, you would have

4  to have an infinite number of time points that you would

5  have to pull samples, and if any of those time points, you

6  know, falls within the scope of the claim, then you're

7  infringing.

8      We don't believe that that really is a

9  reasonable or rational view of things because, you know,

10  what time point are they looking at? I mean, we can't pull

11  samples every millisecond of time in order to give them a

12  concentration at every time point.

13      One of the things that they are asking for --

14      THE COURT: All right. Hold on. Just give me a

15  second.

16      So, Mr. Berl, why don't you switch.

17      MR. GUTMAN: Yes. Sure.

18      THE COURT: I'm trying to balance the burden on

19  the two parties here. Since the point was just raised, help

20  me out. With a concentration level, I would assume they

21  vary during the manufacturing processes. Right?

22      MR. BERL: That's correct.

23      THE COURT: So how do you address that? I mean,

24  is your position going to be if at any point during the

25  manufacturing process it hits that concentration level, then

91

1  there's infringement?

2      MR. BERL: Yes.

3      THE COURT: All right. So then, you know, I

4  guess technically there's an infinite number of time, points

5  of time within the entire processes. So how do you isolate

6  that so that we don't, you know, cause an infinite burden on

7  Amgen?

8      MR. BERL: So let me answer the question you

9  have asked Mr. Gutman, which is how hard is it to pull a

10  sample?

11      THE COURT: Why can't you answer my question?

12      MR. GUTMAN: Well, sure. Well, it is the same

13  answer, so I will do that. The answer is, they can give us

14  samples every day, once a day. And the reason I say that

15  is they already take samples every day. They already do

16  that.

17      Whenever they manufacture, they take a daily

18  sample, and I'm reading from page 203 of Ms. Nack's 30(b)(6)

19  testimony. When I said, the material that's taken from the

20  bioreactor and some volume of that is this some kind of very

21  every day. And she explains at page 203, some of it goes to

22  be tested in certain tests that they do and the remainder of

23  that sample is discarded. It goes down the drain.

24      THE COURT: Okay.

25      MR. BERL: That's what we want. We want what

92

1  they pour down the drain.

2      THE COURT: Okay. Then you would be satisfied

3  with that?

4      MR. BERL: That's what they can reasonably

5  produce. I think if our expert may say it's X at that time

6  and .9 at that time, and .8, then maybe it was .85 at this

7  time, and they can do some kind of interpretation and have

8  an argument.

9      THE COURT: Right. What Mr. Gutman is saying,

10  they ought to do it in person and have experts opine what

11  the concentration level would be.

12      MR. BERL: Obviously, that has to be informed

13  actually having samples with data, which we don't have. By

14  the way, just to correct what Mr. Gutman said, the witness

15  did not say she could calculate the amount of cystine. She

16  said the opposite. So we want just what they take already.

17  Every day they take a sample. They test part of that sample

18  and the rest of it. We don't want them to pour it down the

19  drain. That doesn't sound like a burden at all. We want

20  them to preserve it and send it to us. We've even offered

21  to send someone there, our expert there so she can inspect

22  it. She can have the sample delivered and she can direct

23  it.

24      THE COURT: How many samples do you need?

25      MR. BERL: From their manufacturing process, it

93

1  would be a sample that they take every day.

2      THE COURT: Well, there's 365 days in a year.

3      MR. BERL: ████████████████████████████████████

4  ████████████████████████████████████████████████████

5  ████████████████████████████████████████████████████

6  ████████

7  ████████████████████████████

8  ████████████████████████████████

9  ████████████████████████████████████████████

10  ████████████████████████████████████████████████████

11  ████████

12      THE COURT: So let's say we compel Amgen to give

13  you the samples from █████████████████████████████████████

14  ████████ and I don't have any idea. This is like just

15  pouring from a faucet or is this some kind of very

16  complicated chemical process that's very expensive and

17  cumbersome? I don't have a sense of that.

18      MR. BERL: Yes. They put a bag, a receptacle,

19  underneath the bioreactor and some volume of that is

20  discharged into the bag. They take the bag. They do a

21  little testing for pH and maybe one or two other things on

22  the bag. Some of it remains after they do the testing we

23  need. That's all we want is what remains. What they do

24  with that, what they did with that after we asked them for

25  it repeatedly is they threw it down the drain. That's

1  another problem that I think we'll have to address somehow

2  down the road.

3      THE COURT:  All right.  Now, can you live

4  with -- so you have basically left yourself two claims, but

5  you've asked for 19.

6      MR. BERL:  I don't think it's exactly right.  I

7  think once we got the discovery we needed, it's not clear we

8  would limit it to two claims of Carvalhal.

9      THE COURT:  No, no, I'm not saying that.  But if

10  you've got to add -- in other words, what I don't want to do

11  is -- and in fairness to Mr. Gutman and Amgen is, you know,

12  there was a working out of an order, and we all have --

13  everybody, both parties and the Court have got to reduce the

14  number of patent and claims that are going to be not only

15  tried, but interpreted.  Right?

16      So you identified the unfairness to date because

17  you have to shoot in the dark to limit the claims related

18  to the concentration levels of these chemicals.  Is that

19  correct?

20      MR. BERL:  That's correct.

21      THE COURT:  All right.  That can be solved by

22  sampling, in your view?

23      MR. BERL:  Yes.

24      THE COURT:  All right.  So would you then agree

25  if we were to revise the scheduling order and extend the

1  number of claims that you couldn't change the existing 18

2  you've identified and we could come up with a number after

3  the sampling you would have to reduce that 19 to some

4  smaller number?

5      MR. BERL:  Yes.

6      THE COURT:  All right.  All right.

7      MR. BERL:  Can I --

8      THE COURT:  Go ahead.

9      MR. BERL:  I want to make one other observation

10  about how we move forward, and that is in my experience,

11  Your Honor, the number of claims is not actually the key

12  driver of the burden on the Court during the claim

13  construction proceeding.  It's actually the number of terms

14  to be construed.

15      THE COURT:  Sure.

16      MR. BERL:  And I really don't think that having

17  37 claims rather than 20 increases in any substantial way

18  the number of terms that will be disputed.  The terms that

19  Mr. Gutman read when he said, oh, look at these terms in

20  claim 41, cysteine, copper, et cetera, those are all in

21  claim 1.

22      Those claims, if they're disputed, and I'm not

23  sure how they could be, but if they're disputed --

24      THE COURT:  Look, I hear you, but I just think

25  probably even in my limited experience, you know, there's

1  some proportional relationship between the number of claims

2  and the number of terms.  I agree it's not a direct

3  correlation, but we're all better off if we can reduce the

4  number of claims.

5      MR. BERL:  I understand that.  Your Honor asked

6  if there's a process that we can undertake to move this

7  forward, and I would submit that the existing case

8  scheduling order has such a process where the parties

9  identify claim terms in dispute and then meet and confer to

10  try to narrow the disputes.

11      We don't think that many claims in -- many claim

12  terms in these claims require a construction at all.  I

13  have no reason to believe that the burden on the Court for

14  claim construction will be that substantial with the 37

15  claims.

16      I may be proven wrong by the meet-and-confer

17  process.  I don't know what Amgen tends to construe, but we

18  don't think there are many claim terms that require the

19  Court's construction even now.

20      If you are asking me how can we narrow it down

21  from 37 now, I think what I discussed with Your Honor is the

22  way to do it.

23      THE COURT:  I was hoping you were going to say,

24  if you had the sampling, you could go down from 37 to

25  something closer to 20.  I think you probably did say

1  something like that.

2      MR. BERL:  I did and I will say it again in case

3  it was unclear.

4      THE COURT:  All right.  Mr. Gutman, can you

5  address the feasibility of providing samples over the next

6  manufacturing run?

7      MR. GUTMAN:  Yes, Your Honor.  So, first of all,

8  to address Mr. Berl's point about attaching a bag and you

9  just kind of, you know, that's not how it works.  It's a lot

10  more complicated than that.

11      And the --

12      THE COURT:  So give me some idea, again, mindful

13  of time, of how it's so much more complicated.

14      MR. GUTMAN:  Yes, Your Honor.  Again, any

15  modification of the existing process including sampling

16  needs to go through this documentation process, and

17  then --

18      THE COURT:  Are you literally throwing the

19  samples down the drain at this point?

20      MR. GUTMAN:  Well, no.  That's -- that's part --

21      THE COURT:  What do you do?  I thought you were

22  using a metaphor.

23      MR. GUTMAN:  The samples are processed in a way

24  so that there's certain information that is garnered from a

25  sample.

98

1    THE COURT: I get that. When you take the bag
2  and take a sample and you test the pH and all the other
3  stuff you have to test, there's some residue. Right?
4    MR. GUTMAN: Well, so when you pull a sample
5  from the bioreactor, Your Honor, you're pulling the cell
6  culture fluid.
7    THE COURT: Okay.
8    MR. GUTMAN: And depending on the kind of
9  testing that you are doing. And it's not the same testing
10  every day, so there are different kinds of testing that are
11  occurring from day to day during the manufacturing process.
12    You might test the cell culture fluid, and once
13  you test it, you might not need the rest of the cell culture
14  fluid.
15    THE COURT: So what do you do with it?
16    MR. GUTMAN: You dispose of it.
17    THE COURT: That's my question. Do you throw it
18  down the drain literally or what do you do with it?
19    MR. GUTMAN: You dispose it in a biosafety --
20    THE COURT: Okay.
21    MR. GUTMAN: These are biohazard.
22    THE COURT: And you are telling me that you
23  would have to have -- so you would document that you took
24  some of that sample and gave it to them. Why is that so
25  burdensome?

99

1    MR. GUTMAN: Well, I don't know that we -- I
2  don't know that plaintiffs' description about the kind of --
3  they want specific kinds of tests. They want to do specific
4  kinds of testing.
5    THE COURT: He literally said, as I understand,
6  you've got agreement on, that when you test -- first of all,
7  you test daily. Is that right?
8    MR. GUTMAN: We do. We test daily, but we do
9  certain kinds of testing on certain days.
10    THE COURT: Okay. I get it. I actually think
11  you would serve your own arguments better if you would just
12  answer questions directly.
13    So you take a sample every day of a
14  manufacturing process. Is that right?
15    MR. GUTMAN: Yes, Your Honor.
16    THE COURT: Do you only take one sample a day or
17  do you take multiple samples?
18    MR. GUTMAN: As far as I recall, the sampling
19  that's done is specific to the kind of testing that's
20  required for that day.
21    THE COURT: Does that mean on certain days you
22  take more than one sample, if you know?
23    MR. GUTMAN: I don't know, Your Honor.
24    THE COURT: Okay.
25    MR. GUTMAN: Exactly. I think it is actually

100

1  generally one sample per day, but there might be some
2  additional smaller samples for additional tests, different
3  types of testing.
4    THE COURT: All right. So --
5    MR. GUTMAN: Your Honor, may I clarify
6  something?
7    THE COURT: Sure.
8    MR. GUTMAN: The reason why I'm talking about
9  the different kinds of testing for the samples is because
10  the samples are processed. So what ultimately gets disposed
11  of depends on the kind of testing that is done. And so when
12  I say that the cell culture fluid is removed from the
13  bioreactor, that sample is essentially all destroyed because
14  it's spun down in order to do a certain kind of testing on
15  the fluid that remains after it's spun down. And so there
16  are different kinds of fluids.
17    THE COURT: So if it changed, it could change
18  the concentration then?
19    MR. GUTMAN: It could change the concentration.
20  It may be totally irrelevant to, you know, what they want to
21  test for. And so that's why I'm bringing to the Court's
22  attention that depending on the kinds of testing that is
23  done will dictate the kind of sample that would remain
24  before we dispose of the residual sample.
25    So the residual sample may change depending on

101

1  the kind of testing that is actually done, and I don't think
2  that they're interested in, you know, all of the residual
3  samples because they've been modified as a result of the
4  testing that we're doing.
5    THE COURT: Do you think you could work out with
6  them then, if they select samples?
7    MR. GUTMAN: I think that we could certainly
8  discuss it, yes. I mean, they know, or they appear to know
9  what our testing sampling regimen is. They certainly have
10  documents that speak to that, and so if there were, you
11  know, specific samples that they wanted, that could be
12  something that, you know -- they would need to come to us
13  with specificity and say, we're interested in this sample or
14  this sample because just saying they want the residuals of
15  every sample on every day, it changes depending on the kind
16  of testing that's being done.
17    THE COURT: So is there any way on this issue if
18  we took a break, and I don't mean you have to do it right
19  away, but I'm going to break from the issue, you guys could
20  just work out some compromise that Amgen would provide
21  certain samples from its next manufacturing run, the two
22  sides agree on what those samples are, and then once
23  Genentech has that sampling, then they would have to narrow
24  the 19 claims to some workable number? I mean, that seems
25  to me to be a potential road we could follow to get the case

1 moving and not jeopardizing your deadlines, because I'm with
2 you. I understand why you want to move this case, and
3 believe me, former Judge Sleet, he communicated that, that
4 we ought to try to keep the deadlines. But I've got to also
5 be cognizant of due process to a plaintiff.
6          Is that something that you think you could try
7 to work with the plaintiff to resolve?
8          MR. GUTMAN: I think if the plaintiffs came
9 forward and made a concrete proposal as opposed to just
10 asking generally for samples, but they know what our
11 sampling schedule is. If they said, we want a portion of
12 this sample on this day, a portion of this sample on this
13 day, and gave us specifics about what they wanted, that
14 could be something that we could work with. But just asking
15 generally for samples of everything, that just, you know, I
16 don't think that serves their interest in calculating what
17 the concentrations are.
18          THE COURT: All right. Sorry.
19          MR. GUTMAN: Yes.
20          THE COURT: Mr. Berl, so I hear your point that
21 the concentration levels vary. I get that.
22          Do you dispute what Mr. Gutman said, depending
23 on the type of testing that's done with the samples, that
24 the residual stuff, the concentration level could vary.
25 Right?

103

1          MR. BERL: I don't know that that is right.
2          THE COURT: Okay. You don't know.
3          MR. BERL: I know what they have and you asked
4 whether it was vernacular when you said it goes down the
5 drain. I was quoting. This is page 203 from their 30(b)(6)
6 witness. It's discarded. It is literally dumped. It's
7 poured down the drain.
8          THE COURT: All right.
9          MR. BERL: That's what we want. There's no
10 burden to giving us what they pour down the drain. We want
11 the daily sample. I don't think there's any mystery here.
12 They do pull more than one sample some days, so we want
13 what's left of that, too. We want what they pour down the
14 drain. That doesn't seem too much to ask.
15          THE COURT: Are there cases out there where
16 Courts have compelled sampling?
17          MR. BERL: Yes. This happens in ANDA cases
18 frequently. I don't have them at my fingertips to cite,
19 Your Honor, but the answer is yes.
20          THE COURT: Mr. Gutman, do you agree with that?
21          MR. GUTMAN: I'm not aware of any specific cases
22 where Courts have just generally compelled sampling to
23 determine the concentrations of those because --
24          THE COURT: Well, that wasn't the question. All
25 right. The question was: Are you aware of what Mr. Berl

1 represented, was that in ANDA cases, Courts routinely order
2 sampling. I said, do you agree with that?
3          MR. GUTMAN: I'm not aware of that, Your Honor.
4          MR. SILVER: Your Honor, Dan Silver from
5 McCarter & English. I'm involved in plenty of ANDA cases
6 and commonly samples are exchanged among parties without the
7 need to resort to the Court, but I've certainly been
8 involved in disputes regarding samples. One case that comes
9 to mind in particular was a case in front of Judge Andrews,
10 Novartis versus Watson. The accused product was a generic
11 version of the Novartis Exelon patch and Novartis was
12 seeking samples of not the final finished product, but all
13 of the excipients that went into it for purposes of
14 measuring the antioxidant in the final finished product, and
15 Judge Andrews ordered the production of that material.
16          MR. GUTMAN: Yes, Your Honor. I think that's an
17 important distinction. Mr. Silver isn't referring to cases
18 where there are these complicated biological manufacturing
19 processes. In the ANDA cases where I do know there have
20 been sampling issues, it's about the raw materials. It's
21 not about sampling of intermediate time points along the
22 manufacturing process.
23          THE COURT: But if you stipulated to that, your
24 expert can say whatever your expert can say, that this is
25 not a representative sample. Something occurred during the

105

1 process that causes doubt as to whether the concentration
2 level that's measured in the sample is a legitimate
3 representation of a representative sample. I mean, I'm not
4 sure I'm persuaded by that.
5          So if we kept the existing schedule, Mr. Berl,
6 so that, or something close to it, all right -- well,
7 actually, let me ask. Mr. Gutman: Can you tell me when the
8 next manufacturing process begins?
9          MR. GUTMAN: If you gave me a couple of minutes,
10 Your Honor, I could find out, but I'm not exactly sure.
11 I believe it is this month, but I'm not certain about
12 that.
13          THE COURT: So I think he offered you a little
14 breather. Why don't we come back at 1:40. Would that be
15 enough time, Mr. Gutman?
16          MR. GUTMAN: I think so, Your Honor.
17          THE COURT: Do you want a little bit more?
18          MR. GUTMAN: Why don't we --
19          THE COURT: 1:45?
20          MR. GUTMAN: We could let you know if we need
21 more time, but I think ten minutes could do the trick,
22 so I don't want to unnecessarily spend more time on that
23 issue.
24          THE COURT: All right. Great. Thanks. We'll
25 break.

106

1    MR. BERL:  Thank you, Your Honor.

2    (Short recess taken.)

3    - - -

4    (Proceedings resumed after the short recess.)

5    THE COURT:  Thank you.  Be seated, please.  All

6  right.  Thank you for being patient.

7    Mr. Gutman, do you have anything to shed light

8  on?

9    MR. GUTMAN:  Yes, Your Honor.  I do.

10    THE COURT:  Okay.

11    MR. GUTMAN:  ███████████████████████

12  ███████████████████████████████

13  ███████████████████████████████

14  ████████████████████████████████

15  ████████████████████████████████

16  ███████████████████

17    THE COURT:  Okay.

18    MR. GUTMAN:  ████████████████████████

19  ██████████████████████████████████

20  ██████████████████████████████████

21  ████████

22    THE COURT:  ██████████████

23    MR. GUTMAN:  █████████

24    THE COURT:  Okay.

25    MR. GUTMAN:  ████████████████     And so we

107

1  think that what we would be able to do is -- I don't know

2  the exact timing, but I would think that it would be

3  possible to get them samples that were pulled during that

4  production phase maybe within -- within a week of the end of

5  the production phase, which would put us, you know, toward

6  the end of October, the beginning of November.

7    THE COURT:  Okay.  That's very helpful.  Did you

8  communicate that already with the plaintiffs before we

9  started?

10    MR. GUTMAN:  No, Your Honor.

11    THE COURT:  I'm not faulting you at all.

12    MR. GUTMAN:  No.

13    THE COURT:  Mr. Berl, could you live with

14  that?  What I'm trying to do here again is to balance the

15  burden.

16    So if you were to be given samples for each day

17  of that one, would you agree that's it?  You're good at that

18  point for sampling unless you show good cause, like

19  something comes up.  I'm not at all expecting this, things

20  were tampered with, or God forbid, something like that.

21  Assuming samples are fine in the ordinary course, would

22  you agree that with Document 54, RFP 54, that would

23  satisfy Amgen's obligation to produce samples pursuant to

24  that RFP?

25    MR. BERL:  For that run, I think certainly.  You

108

1  know, there may be arguments about whether different runs

2  have different amounts, and as I said, that's a whole

3  separate issue, I think that sort of what we do with the

4  samples that we're already throwing down the drain.

5    THE COURT:  No.  You can't get those samples.

6    MR. BERL:  Agreed.

7    THE COURT:  I'm just trying to deal with the

8  sample.  I mean, are you going to come back -- is that

9  person with you?

10    MR. BERL:  Yes.

11    THE COURT:  All right.  Just so the record

12  knows, I was pointing out somebody who has walked into the

13  courtroom.

14    What I want to avoid in fairness to Amgen is,

15  they give you these samples, and then in December you say,

16  oh, we want more samples, because I think they're stepping

17  forward and it sounds like they're willing to, you know, try

18  to get this case managed.

19    MR. BERL:  Yes.  And so with respect to that

20  run, we would be happy with the samples that Mr. Gutman was

21  referring to.

22    THE COURT:  I get that.  Right.  And then with

23  respect to --

24    MR. BERL:  With respect to prior runs,

25  obviously, there's nothing we can do with respect to

109

1  that.

2    THE COURT:  With respect to future runs, you do

3  not need future runs of samples unless you say something was

4  revealed to suggest or to indicate that the samples that

5  were obtained for the October processes were invalid and

6  insufficient for you to conduct --

7    MR. BERL:  Correct, or let's say there's a run

8  in December and I don't know that there is just for purposes

9  of answering your question.  If there were reason to believe

10  that the numbers in December would be different than the

11  numbers from the samples we got in October, then obviously

12  we would raise that issue with Amgen and the Court, and

13  hopefully, they would do the same thing again.

14    If there's reason to believe everything is just

15  going to be the same, they're running the exact same process

16  with the same materials, then that production from this

17  October run would satisfy.

18    THE COURT:  Okay.  So I have to tell you, if we

19  can reach an agreement today that gets you the October

20  samples, the chances of me allowing you to get future

21  samples are infinitesimal.  You would have to basically show

22  some kind of fraudulent conduct on behalf of Amgen or some

23  kind of intentional actions to change the concentrations

24  that would be normally obtained during the manufacturing

25  process.  All right?

110

1      MR. BERL:  Understood.
2      THE COURT:  Mr. Gutman, can you live with that?
3      MR. GUTMAN:  Yes, Your Honor.
4      THE COURT:  Okay.
5      MR. GUTMAN:  I think that's fine.
6      THE COURT:  All right.  Now, now in fairness
7  then to Amgen, they're going to go through this, it seems to
8  me it's incumbent upon Genentech to do its best to narrow
9  the number of claims once this information is put in
10  Genentech's hand.
11      Do you agree with is that, I hope?
12      MR. BERL:  I do.
13      THE COURT:  All right.  Now, looking at the
14  schedule.  So let's say -- I apologize, Mr. Gutman.  How
15  many days after October 26th did you say it would take to
16  get Genentech the sample?
17      MR. GUTMAN:  I would need to confirm with
18  technical people, but I would hope we could get them the
19  samples within a week of the end of the process.
20      THE COURT:  All right.  So, Mr. Berl,
21  October 26th is a Friday.  Again, I'm not going to hold
22  Mr. Gutman to a week.  He's trying to do his best to
23  estimate it.  Ballpark it around a week.  That would put it
24  at November 2nd.
25      How much time would you need to examine the

111

1  samples, have your experts examine the samples such that you
2  would be in the position to reduce the 19 claims that you've
3  identified to date to some -- let's step back before I ask
4  that question.
5      Let's talk about what is the realistic number
6  that would help all parties work through this case.  I was
7  thinking of 25 claims, total.  In other words, Mr. Gutman, I
8  was thinking, they have to narrow the 19 to 7.  I hear you,
9  you agreed to 20.  I get that.  But in fairness to them,
10  they've got due process rights.
11      Could you live with 25 claims?
12      MR. GUTMAN:  I think we could live with it, Your
13  Honor.  I think that -- I'm not sure whether the additional
14  five claims, you know, really implicates due process
15  concerns, but it's something that we could live with.
16      THE COURT:  Well, incidentally, I think we're
17  going to get rid of the due process concerns.  I will tell
18  you why.  I'm confident we're going to get rid of them.  As
19  I said earlier today, if we reach a point where we're going
20  to trial and the plaintiff believes its due process rights
21  have been violated because it wasn't able to afford a
22  representative claim, I mean, they'll raise it.  I don't
23  think they're going to be able to be in a position to do
24  that.  I think given the way we've managed the case, but
25  they'll have that opportunity.  Right?

112

1      So, Mr. Berl, could you live with 25 claims
2  after you get to look at these samples?
3      MR. BERL:  Yes.
4      THE COURT:  So why don't we then revise the
5  scheduling order to reflect that -- oh, sorry.  I apologize.
6  I need to get a date.
7      So now how much time do you need, Mr. Berl, to
8  get from 19 to 7 claims after you are in possession of the
9  samples?
10      MR. BERL:  And I wish I could give you a number.
11  I think what you're really asking me is how long do we need
12  to test the material.
13      THE COURT:  Yes.
14      MR. BERL:  How long do my experts need to get to
15  this facility and that facility and see what's in the
16  samples that we've obtained.  Not certain of that.  I think
17  we could do it within a month.  That is the whole testing
18  process, and then we'll have to analyze the tests with our
19  experts, of course, and make the selection based on that
20  data.
21      THE COURT:  So what I would do is, I was looking
22  at your, what you've got currently in the scheduling order.
23      So for starters -- and, Mr. Gutman, you can have
24  a seat.  You don't need to stand up.  When you speak, you
25  can.  Mr. Berl, if you want to silt down, too.

113

1      MR. BERL:  Sure.
2      THE COURT:  Whatever suits you.
3      You may be aware, I think that Delaware counsel
4  are aware, I'm going to use the claim construction
5  procedures essentially that Judge Andrews uses, so in
6  briefing I don't want to engage in a simultaneous briefing.
7  I want to do the process pursuant to which plaintiff will
8  serve but not file an opening brief.  Defendant will
9  respond, serve, but not file and do a reply and surreply
10  brief, and then you will present to the Court one joint
11  brief.
12      Now, you should pay attention.  We're going to
13  work with you to revise the order that will have that
14  procedure set forth.  I've got some page limitations and
15  notice especially to Delaware counsel.  I just was informed
16  yesterday that there's a typographical error, there was in
17  my form order on word limits and they were way off and very
18  unfair to the plaintiff who, unfortunately for him,
19  volunteered or informed me of this yesterday, and then
20  I reduced his page limits to make it fair, or his word
21  limit.
22      So I revised the order as of yesterday.  I also
23  added a paragraph inviting parties to submit cases.  If you
24  could note that there's a new order on the website, you
25  can use that form.  Okay.  Anyway, those revisions will have to

114

1  be made.  So that factors in.  And then I want 30 days from
2  the time you submit the joint brief until the Markman
3  hearing.
4       Now, I was looking at your briefing schedule
5  under Judge Sleet's procedure and that I guess had
6  simultaneous briefs, the answering brief being filed on
7  January 25th, I believe.  Right?
8       MR. GUTMAN:  Yes, Your Honor.
9       THE COURT:  So if I was going to use that as
10  kind of the proxy for my joint claim construction brief, the
11  problem is if you work backwards and you factor in this
12  testing we're talking about, right, we're going to have to
13  move it.  But in fairness to Amgen, I think we should really
14  limit how far out we move it.
15       So you get the samples November 2nd.  You get a
16  month, December 2nd.  And then you've agreed, you'll
17  identify, you'll reduce it to seven claims.  That would be
18  on December 2nd.  And then you need some time to figure out
19  what the terms are you're going to dispute.
20       Mr. Gutman, I'm going to give you essentially
21  the choice here.  What I just described is one way we could
22  work it so that when you guys had your meet and confer on
23  the joint terms, Genentech would have already reduced the
24  number of claims.  You would have a reduced number of claims
25  to review to select what terms you want.

115

1       All right.  The downside for Amgen in doing that
2  is it pushes the schedule back.  The alternative would be to
3  keep the current dates and then you're going to have to
4  review though all 19 claims when you have your meet and
5  confer to decide what terms.  Right?
6       So you have more work to do at the beginning,
7  and then the terms that are in the claims that drop out are
8  gone, but you will have had to review those claims before
9  you had the meet and confer.
10       Which would you prefer?
11       MR. GUTMAN:  Your Honor, I think that it would
12  make sense to continue to move through the claim
13  construction process.
14       THE COURT:  Okay.
15       MR. GUTMAN:  I don't see there really being a
16  benefit to just putting everything on hold, waiting for
17  plaintiffs to conduct their analysis on the samples and then
18  starting up after that.  There are definitely, you know,
19  claims and claim terms that I think, you know, we could
20  address now.
21       THE COURT:  Well, I'm not going to come back,
22  just so you'll know.  We'll only have one Markman hearing,
23  but as long as you're willing -- I mean, the advantage is --
24  not the advantage.  The reality is that if they narrowed the
25  19 to 7 and there were terms that you guys had agreed on

116

1  that fall out, then they're just not going to be presented
2  to me in the Markman hearing.
3       MR. GUTMAN:  Right.
4       THE COURT:  The only downside is you have to do
5  the work beforehand.  Right?
6       MR. GUTMAN:  Yes, Your Honor.
7       THE COURT:  Okay.  So, Genentech, I assume
8  you're going with that.
9       MR. BERL:  Sure, Your Honor.
10       THE COURT:  Okay.  So then we'll keep the
11  dates.  We will keep the dates for the -- wait.  Excuse me.
12  Hold on.
13       Well, let's go through the dates then.  Are you
14  guys prepared then to exchange a list of terms to be
15  construed in two days, because we'll just accept your 37
16  claims.
17       MR. BERL:  Yes, Your Honor.  We're prepared to
18  do that.
19       THE COURT:  Mr. Gutman?
20       MR. GUTMAN:  I believe we could, we could meet
21  that deadline.
22       THE COURT:  Okay.  Let's keep it.
23       And then are you good with the October 26th date
24  for exchanging lists of proposed constructions?
25       MR. BERL:  Yes, Your Honor.

117

1       MR. GUTMAN:  I believe so, Your Honor.
2       THE COURT:  All right.  How about the
3  November 2nd date for you to meet and confer to narrow claim
4  construction disputes?  Can you both live with that?  Mr.
5  Berl?
6       MR. BERL:  Yes, Your Honor.
7       THE COURT:  Mr. Gutman?
8       MR. GUTMAN:  Yes, I think so.
9       THE COURT:  All right.  Okay.  And then how
10  about the November 16th, you would submit to the Court a
11  final joint claim construction chart.  Can you all live with
12  that?
13       MR. BERL:  Yes, Your Honor.  I suppose it might
14  have some extraneous --
15       THE COURT:  I know in the end some may drop out.
16  I get that.  That's why I said I'm letting Mr. Gutman
17  choose.
18       MR. GUTMAN:  I understand, Your Honor.  It might
19  be worth moving that date up, Your Honor.
20       THE COURT:  I don't want to move it up.  Why
21  would I want to move it up?
22       MR. GUTMAN:  The only reason why I'm thinking
23  about that is because I'm contemplating that we are going to
24  try to squeeze in the new, Your Honor's procedure about how
25  to brief the claim construction issues, and I'm just

118

1 anticipating because there would be more briefing events, we
2 would need possibly more time in order to cover those
3 briefing events.
4         So I would rather, for example, move that date
5 up and, you know, consider holding strong on the
6 Markman/claim construction date if possible, or moving that
7 less.  So it's just -- it all depends on how it works out
8 with the actual briefing, and so I'm just trying to come up
9 with different ways to perhaps create some more time to
10 allow for Your Honor's briefing procedure.
11         THE COURT:  All right.  I'm going to have to
12 move February 21st as a date.  I told you I want to keep it
13 as close as I can, but I have to move it anyway.  I have a
14 trial, and it's definitely going to trial.
15         MR. GUTMAN:  Okay.
16         THE COURT:  So it has to give a little bit.  I'm
17 going to try to do it as soon thereafter as I can.  So let's
18 hold your thought there now but let's keep the date of
19 November 16th.
20         So, Genentech, right now you've got your opening
21 claim construction brief, it would have been filed on
22 December 21st.  You had almost a month.  Now you're going to
23 be exchanging openings.
24         So given that, any chance you could move that
25 date up, or are you really wedded to keeping that

119

1 December 21st date?
2         MR. BERL:  Your Honor, obviously, that brief
3 would be informed by the selection that we make on
4 December 2nd, which will be informed by whatever data we
5 obtain from our testing before then.
6         THE COURT:  Yes.
7         MR. BERL:  I'm just a little concerned about
8 giving ourselves less than the 19 days that we already
9 have.
10         THE COURT:  I think that is fair.
11         MR. BERL:  To get a brief together.
12         THE COURT:  I think that's fair.  All right.
13         So then let's say you get your opening brief,
14 Mr. Gutman, on December 21st, and you're the one who is
15 pressing most for time.  What's the earliest you can get an
16 answer go brief served on Genentech?
17         MR. GUTMAN:  I think, Your Honor, the original
18 schedule the parties took into account the holidays,
19 obviously, and --
20         THE COURT:  Yes.  Look, Mr. Gutman, you can do
21 whatever you want.  Seriously, you've been gracious.  It's
22 your call.  We're trying to suit your client's interests in
23 expediting this, so you just tell me.  I mean, I will tell
24 you at the end of the day, I have to have a month.  I want
25 to be prepared for a Markman hearing.  It's going to be

120

1 beneficial to you all, too.
2         MR. GUTMAN:  No.  I understand that, Your Honor.
3         THE COURT:  So you've got to exchange back and
4 forth, you know, four briefs, get them filed, and then I
5 have to have a month.
6         MR. GUTMAN:  Can I take a minute, Your Honor?
7         THE COURT:  Sure.
8         MR. GUTMAN:  Thank you.
9         THE COURT:  I wish we were frankly sitting at a
10 conference table in chambers.  This is a very informal
11 setting for right now for our purposes.
12         (Pause while counsel conferred.)
13         MR. GAFFNEY:  Your Honor, you had mentioned
14 earlier -- I'm sorry, for the record, Paul Gaffney for
15 Genentech.
16         You mentioned earlier there would be some case
17 management discussions.  Is that what we're doing now?
18         THE COURT:  Yes.  Is that a problem?
19         MR. GAFFNEY:  No, no, no.  In the interests of
20 full disclosure, ████████████████████████████████████
21 ████████████████████████████████████████████████████
22 ████████████████████████████████████████████████████
23 ████████████████████████████████████████████████████
24 █████████████████████████████████████████████
25 ████████████

121

1         THE COURT:  All right.  I have not gotten to the
2 other implications of there are five other cases that
3 Genentech has brought against three other parties.  Right?
4         MR. GAFFNEY:  There will be -- I mean --
5         THE COURT:  I'm saying, there are already, I
6 think.
7         MR. SILVER:  Your Honor, there's another set of
8 cases where Genentech has sued biosimilars on the Herceptin
9 product.
10         THE COURT:  Correct.
11         MR. SILVER:  I represent Genentech in one of
12 those cases.  It's a whole different slew of counsel.
13         THE COURT:  I know there's a different slew.
14         MR. SILVER:  Yes.
15         THE COURT:  I think there are some patents that
16 overlap.
17         MR. GAFFNEY:  There are some patents that
18 overlap.
19         MR. SILVER:  Yes.
20         THE COURT:  Yes.
21         MR. GAFFNEY:  This currently is the only Avastin
22 case, although this is a matter of public record, that
23 Pfizer has applied for FDA approval, which means the whole
24 statutory cascade of activities will start, and I assume
25 given what has happened in all the other instances where

122

1    people have applied, litigation will follow over Avastin.
2    I'm talking about --
3             THE COURT:  You're talking about this case?
4             MR. GAFFNEY:  Well, not this case.
5             THE COURT:  Amgen?
6             MR. GAFFNEY:  Amgen, when it got approval for
7    this product that we're fighting over --
8             THE COURT:  Right.
9             MR. GAFFNEY:  -- got approval for a small
10   production for a small manufacturing facility in Thousand
11   Oaks. █████████████████████████████████████████
12   ██████████████████████████████████████████
13   ████████████████████████████
14            THE COURT:  Okay.
15            MR. GAFFNEY:  So we've gotten that application.
16   We are reviewing it.  The statute gives us a period of
17   time.
18            THE COURT:  But how is it going to affect this
19   case?
20            MR. GAFFNEY:  It's not.
21            THE COURT:  Okay.
22            MR. GAFFNEY:  We already have two cases here
23   between these clients.  You've got two captions and there's
24   going to be a third.
25            THE COURT:  All right.  I appreciate it.  Let's

123

1    not forget before we leave here, we need to address
2    consolidation of these two cases.
3             We still have a couple of outstanding discovery
4    disputes.  I have not forgotten those.
5             MR. GUTMAN:  Thank you, Your Honor.
6             THE COURT:  I thought I'd take advantage of the
7    momentum we gained in the first discovery dispute.
8             Mr. Gutman, go ahead.
9             MR. GUTMAN:  I think, Your Honor, without
10   knowing where we're headed in terms of the Markman date
11   hearing, I think that we should stick with the January 5th
12   date for our responsive brief.
13            THE COURT:  Okay.
14            MR. GUTMAN:  And if we need to accelerate
15   things, maybe we can work with the clients for surreply
16   briefs.
17            THE COURT:  Yes.  All right.  So let's do that.
18            So then how about their reply.  Do you want to
19   say February 5th?
20            MR. BERL:  I have not reviewed Your Honor's
21   claim construction procedures exactly in terms of the claim
22   limits, et cetera.  My understanding is that briefing Amgen
23   is putting on January 25th is a substantial brief in terms
24   of --
25            THE COURT:  It is.  I think it's 8,250 words,

124

1    which is basically 250 pages of words, which is about
2    30 pages.
3             MR. BERL:  Right.
4             THE COURT:  And so you get to come back with
5    5,550, which is where my order changed.  I think it
6    previously said it gave you 10,000 or 11,000.  11,000.
7             MR. BERL:  Okay.  I think it's going to take
8    more than ten days to answer that 8,250 --
9             THE COURT:  That's fair.  I was just throwing
10   the date out there.
11            So --
12            MR. BERL:  So February 20th?  I don't even know
13   honestly what days of the week you're talking about.  I
14   don't have a calendar.
15            MR. GUTMAN:  Your Honor, February 20th is more
16   time than we're using to respond to their brief.
17            MR. BERL:  It's actually less.  Mr. Gutman is
18   taking from December 21st to January 25th.  That's five
19   weeks.  I'm suggesting three-and-a-half.
20            MR. GUTMAN:  That includes a holiday and --
21            THE COURT:  Actually, just one thing.  All
22   comments to me as opposed to each other.  All right?
23            MR. GUTMAN:  Yes, Your Honor.
24            THE COURT:  Let's do that.
25            So it is a reply brief.  I mean, the reason why

125

1    they get the substantial one is because they're
2    substantially a proponent of their own claim construction
3    and they're responding to you.  That's why they get the
4    equivalent of 30 pages.  So you'll just be replying to a
5    portion of that brief.  And let's face it, there are some
6    holidays built in there.
7             MR. BERL:  Sure.
8             THE COURT:  So I think normally, a reply brief
9    in our district is ten days, but I understand, so let's push
10   it back some.
11            The stakes here are high on both sides and there
12   is a public interest as well in expediting the resolution of
13   this.  So what can you do?
14            MR. BERL:  Perhaps around the middle of the week
15   of February 11th.  February 13th.  Something like that
16   perhaps?
17            THE COURT:  All right.  We'll start -- I'm not
18   committing to this, but let's try.  All right.  Let's see if
19   we do the 13th.  If we did February 13th, Mr. Gutman, then
20   when would you want to do a surreply?
21            MR. GUTMAN:  Well, I guess, Your Honor, my
22   immediate reaction is, you know, I think the parties should
23   be working with their reply and surreply brief in order to
24   try to -- I'm thinking about kind of moving backwards from
25   when our Markman hearing is.

126

1          THE COURT:  I know.  I think I have four Markman
2    hearings in ANDA cases in March.  Okay.  So not counting a
3    two-week trial.  So I'm working with you, too.  I'm going to
4    do everything I can.  I am willing to work hard to do this.
5    I understand the stakes.
6          So just tell me, go back to how much time --
7    assuming February 13th.  I told them that wasn't set in
8    stone.  If it was February 13th, what do you think you can
9    do to get a surreply in?
10         MR. GUTMAN:  Your Honor, I apologize.  I'm not
11   sure what the word limit is on the surreply.
12         THE COURT:  It's 2,750, I think.
13         MR. SILVER:  It works out to about ten pages
14   under Judge Andrews' standard.
15         THE COURT:  I think I said 250.  I think I am
16   giving you 275.  It gives you more.  It's 14 point font,
17   too.  It makes it easier for me to read.
18         MR. GUTMAN:  I think probably about ten days
19   would take us to the 23rd, but that's a Saturday.  So I mean
20   for purposes of discussion, let's say February 22nd.
21         THE COURT:  Okay.  February 22nd.  Is that
22   President's Day or something?  All right.
23         So February 22nd to March 22nd is Friday.  Give
24   me a second.
25         (Pause.)

127

1          THE COURT:  I appreciate your patience.  This is
2    a lot to juggle here, so I'm trying to figure it out.
3          This Markman, I normally would plan for a
4    three-hour Markman hearing.  I understand Judge Sleet
5    planned for six hours in this.
6          Mr. Gaffney?
7          MR. GAFFNEY:  It's a big case, Your Honor.
8          THE COURT:  So --
9          MR. GAFFNEY:  I would think a day.
10         THE COURT:  Six hours?
11         MR. GAFFNEY:  If you give us a day.
12         THE COURT:  A full day.  Okay.
13         MR. GAFFNEY:  I think so.  Nothing in this case
14   seems to be accomplished in a compressed period.
15         THE COURT:  I know.  I've got a 3:00 o'clock, so
16   we've got to hustle.
17         All right.  What was the date you said?  We're
18   up to February 22nd is the brief, the brief is complete.
19   Right?
20         MR. GUTMAN:  Yes, Your Honor.  And I think the
21   parties could reasonably submit a joint brief the following
22   Monday, on the 27th.
23         THE COURT:  Okay.  February 27th.  All right.
24   How about April 2nd?  All right.  It's a Tuesday.  Full
25   day.

128

1          MR. BERL:  That's workable for us Your Honor.
2    April 2nd.
3          THE COURT:  Mr. Gutman?  Let me just share with
4    you.  Here's my schedule so you understand why I had to move
5    it out.  I've got two Markman hearings the week before.
6    I've got a jury trial the week of the 25th.  I've got one
7    Markman hearing, but I can tell you there's another one
8    coming, it's going to happen at 3:00 o'clock, for the week
9    of March 18th.  I have two Markman hearings the week of
10   March 10th.
11         I just don't have, I don't have time.  And this
12   is an inherited case.  I have to do justice to the parties
13   that file cases with me.
14         MR. GUTMAN:  I understand, Your Honor.
15         THE COURT:  All right.  I will do my best to
16   turn this around.  It's definitely a priority case.
17         Now, keep in mind you already are submitting
18   summary judgment motions that don't come in until the end of
19   March.  Right?  So --
20         MR. GUTMAN:  Well, those summary judgment
21   motions, Your Honor, are on a very narrow issue.
22         THE COURT:  Well, I know, but my point is that
23   it's not like you didn't plan on being in litigation.
24   They're a narrow issue that I would assume affects your
25   client's approach to this case.  I mean, I just --

129

1          MR. GUTMAN:  No.  I understand, Your Honor.
2    It's related simply to damages and the availability of
3    damages.
4          THE COURT:  And a jury trial.
5          MR. GUTMAN:  And, yes.
6          THE COURT:  Which has to be a consequential
7    issue.
8          MR. GUTMAN:  Yes.  Yes.
9          If we're going to have the Markman on the 2nd,
10   then I think that, you know, we would want more time
11   commensurate in scope to the amount of time that plaintiff
12   has for our surreply brief, so we tried to pare that back.
13         THE COURT:  Well, then I've got to move your
14   date back.  The 25th, that's giving me four weeks.
15         MR. GUTMAN:  Oh, if we submitted the joint brief
16   on --
17         THE COURT:  You're submitting the brief joint --
18         MR. GUTMAN:  On February 25th.
19         THE COURT:  I'm trying to build into this.
20   Imagine how complex it is for you, what it's like for us on
21   the receiving end of your briefs and your arguments and your
22   claims.  I need adequate time if you want me to do a good
23   job.
24         MR. GUTMAN:  No, I understand, Your Honor.  I
25   understand.  Okay.

130

1    THE COURT:  All right.  So let's make sure we've
2  got these dates, because we're going to have to put them in
3  an order.
4    You're going to get to the Court on
5  November 16th a final joint claim construction chart.
6    On December 21st, plaintiff will serve, but not
7  file, their opening brief in claim construction.
8    On January 25th, 2019, Amgen will serve on the
9  plaintiff its answering brief.
10    On February 13th, Genentech, the plaintiff, will
11  serve its reply brief.
12    And on February 22nd, Amgen will serve its
13  surreply brief.  Wait a second.  Yes, that's right.
14    And then on February 25th, the parties will file
15  a joint Markman brief pursuant to the policies or, rather,
16  the instructions in a form of order.  They'll be in the
17  order that we issue.
18    All right.  So are we good on that?
19    MR. BERL:  Yes, Your Honor.
20    MR. GUTMAN:  Yes, Your Honor.
21    THE COURT:  One second.
22    (Pause.)
23    THE COURT:  All right.  Now, just so the record
24  is clear then.
25    Okay.  So as far as the first request for relief

131

1  submitted by Amgen dealing with the scheduling orders
2  requirement relative to claims, I think we have resolved
3  that.
4    Would you agree, Mr. Gutman?  I mean, maybe not
5  to your full satisfaction, but we've resolved it.  Correct?
6    MR. GUTMAN:  Yes, Your Honor.
7    THE COURT:  Okay.  So now, Mr. Gutman, if you
8  would like to proceed, or your co-counsel would like to
9  proceed with the other issues that you've raised in your
10  letter.
11    MR. GUTMAN:  Yes, Your Honor.
12    THE COURT:  And, okay.  Here is the thing.  I've
13  got 22 minutes.  I've read your -- actually, let me explain
14  in fairness to you, Mr. Gutman.  I have read carefully the
15  submissions.  I am inclined to deny the relief that you
16  seek, so hit the main points and try to say why you think I
17  would be wrong to deny it.
18    MR. GUTMAN:  Okay.  This is on the issue of the
19  non-custodial documents.
20    THE COURT:  It's on the issue of all the
21  documents, because my general view is you've got discovery
22  built in.  It's coming your way.  You're just trying to
23  expedite is the way I understand it.
24    MR. GUTMAN:  Well, we're trying to expedite part
25  of it.

132

1    THE COURT:  Right.
2    MR. GUTMAN:  The substantial completion of
3  document production, Your Honor --
4    THE COURT:  I get that.  Think about how much we
5  struggled today trying to get deadlines in place.  You've
6  got a deadline.  I don't understand the defendants say
7  they're not going to produce responsive documents.  I
8  understand you're just trying to expedite the production of
9  certain documents.  Correct?
10    MR. GUTMAN:  Well, we're trying to have a
11  reasonable rolling production of documents in view of
12  subsequent deadlines that are part of the scheduling
13  order.
14    THE COURT:  But that is what it's all about.
15  You guys worked hard, as you said, to get these deadlines in
16  place.  Right?
17    MR. GUTMAN:  Yes, Your Honor.
18    THE COURT:  Okay.
19    MR. GUTMAN:  With the expectation that the
20  parties would be reasonable in rolling out their production
21  in view of other deadlines.  I mean, I don't think that --
22    THE COURT:  You say in view of other deadlines.
23  We changed some deadlines today.  Well, I will leave it to
24  you.  I'm just telling you where I'm coming from is, you
25  guys did work out a scheduling order.  It wasn't perfect for

133

1  both sides, but I would just be very -- I would be selective
2  in what you are doing, because I'm generally not sympathetic
3  to the idea we're basically going to move up discovery
4  deadlines for certain documents that weren't built into the
5  scheduling order.  That's where I'm coming from.
6    MR. GUTMAN:  I understand, Your Honor.
7    THE COURT:  Okay.
8    MR. GUTMAN:  Do you want me to address all of
9  the issues?
10    THE COURT:  You can.  I've read them.  Put it
11  this way.  At this point I'm denying the relief you seek.
12  I'm giving you essentially ten minutes if you want to try to
13  persuade me of the errors of my ways.
14    MR. GUTMAN:  Okay.  So, Your Honor, on the first
15  discovery-related issue regarding producing documents prior
16  to the deadline for the substantial completion of document
17  production, our position is that plaintiffs have been
18  holding onto documents and we're going to see a big data
19  dump, you know, in January, which is the deadline for the
20  substantial completion of document production.
21    There are categories of documents that they have
22  not produced that there are upcoming deadlines, including
23  claim construction deadlines as well as the motion for
24  summary judgment regarding the availability of damages in
25  March.  And so, yes, there is a deadline.

134

1   THE COURT: So pick your three or four examples
2   of documents that are really necessary for you to have the
3   claim construction that you have not seen yet.
4   MR. GUTMAN: Well, there's a whole category of
5   documents relating to the date of invention for the various
6   patents that we're construing, and obviously, claim
7   construction occurs from the standpoint of one of ordinary
8   skill in the art. That perspective is defined by the date
9   upon which they're going to rely for their date of
10  invention. If they're now prepared to say that they will
11  not come forward with any date of invention that is prior to
12  the earliest effective filing date of the patents, then I
13  think we can work with that. But if they are going to
14  preserve their ability to argue a different date of
15  invention, for example, in response to our invalidity
16  arguments, then we --
17  THE COURT: Yes. Actually, that's where you
18  just through me for a loop. Again, I have fractions of the
19  experience of patent law that you all do. That seems to me
20  more like an invalidity as opposed to a claim construction
21  issue.
22  MR. GUTMAN: Yes. Claim construction occurs
23  from the standpoint --
24  THE COURT: I understand the doctrine. It's
25  just as a practical matter, are you really thinking that

135

1   them not specifying between now and December 21st the exact
2   date of invention is going to really affect your claim
3   construction approach?
4   MR. GUTMAN: We don't know, Your Honor.
5   THE COURT: But that's one of the three or four
6   categories. I told you to pick three or four that really
7   show me how you might be prejudiced going into the Markman
8   brief.
9   MR. GUTMAN: That's one of them, Your Honor.
10  THE COURT: Okay. Anything else?
11  MR. GUTMAN: With respect to the availability of
12  damages, for eight months now, since February of this year,
13  we've asked for licenses, settlement agreements, documents
14  that bear on the availability of damages, and they have not
15  produced a single document like that. And so these requests
16  have been outstanding for eight months, including on the
17  date of invention documents that I just described to you,
18  and we have not received those documents. And there's
19  really no reason why they shouldn't have been produced in
20  the eight months since the requests have been served.
21  THE COURT: Okay. What else?
22  MR. GUTMAN: That's it on the non-completion,
23  the completion of non-custodial documents, Your Honor.
24  THE COURT: Okay.
25  MR. GUTMAN: So for the next few months the

136

1   parties are going to be focused on custodial production,
2   which will involve, you know, a lot of documents, and from
3   our standpoint, it just doesn't make sense to have delayed
4   on the non-custodial documents given that up through
5   January, the parties are going to be concerned with
6   producing custodial documents. So we don't believe that
7   there has been a reasonable rolling production on those
8   documents.
9   THE COURT: All right. Do you want to hit
10  the damages issue, why you think January 1, 2015, is
11  arbitrary?
12  MR. GUTMAN: Sure.
13  THE COURT: I think it's pretty reasonable to
14  me. Help me understand why it's not.
15  MR. GUTMAN: Sure. One of the issues that's
16  going to arise -- so it's not, it's not -- with respect to
17  damages in terms of the sales of their products and things
18  like that, they've actually agreed to produce documents that
19  predate 2015.
20  The dispute is really about what their
21  expectations and productions are regarding the impact of
22  biosimilarity into the market.
23  THE COURT: Who cares what the projections are?
24  MR. GUTMAN: I think it's bears on issues like
25  irreparable harm. They are arguing that for -- you know, if

137

1   they have, for example, documents that say, oh, we're not
2   worried about the impact of biosimilar penetration into our
3   market and, you know, we're not worried about it because for
4   this reason or that reason or the other reason, that bears
5   directly on whether they've suffered irreparable harm. I
6   mean --
7   THE COURT: I mean, if you find those documents
8   after January 1, 2015, you'll have them. Isn't that a lot
9   more probative than what they thought back in 2009?
10  MR. GUTMAN: Well, no, Your Honor. And the fact
11  that they changed their perception of what's happening in
12  the market, I think that we deserve to have discovery that
13  speaks to what they think the impact will be on a biosimilar
14  presence in their own market, and that speaks to irreparable
15  harm. It speaks to a reasonable royalty. And 2015 is just
16  completely arbitrary.
17  As we stated in the letter, we know that there
18  are documents there because there's at least one publicly
19  available document where they are talking about the impact
20  of biosimilar market penetration. What they are arguing is,
21  they just don't want to go out and look for the documents,
22  but if they're within the possession, custody or control of
23  Genentech or Roche, we deserve to have those documents
24  because they are undisputedly relevant to the issues of at
25  least irreparable harm and damages.

138

1          THE COURT:  Okay.

2          MR. GUTMAN:  And they have asked for materials

3   from us regarding various issues that predate 2015.  And so

4   if 2015 is going to be some arbitrary cutoff date, then it

5   should apply to both parties and not asymmetrically only to

6   what they need to produce.

7          THE COURT:  Okay.  Anything else?

8          MR. GUTMAN:  Not on that issue, Your Honor.

9          On the issue of the e-mail custodians, the ESI

10  protocol that has been agreed to between the parties

11  requires that the parties identify custodians with

12  discoverable information.

13         I don't think it's reasonable to assume that the

14  only discoverable information that Amgen is entitled to is

15  damages information, which is why they identified only

16  custodians that relate to damages issues.

17         They have not identified any custodians that

18  relate to non-damages issues.  For example, more

19  particularly --

20         THE COURT:  But you've propounded document

21  requests, I assume.  You've propounded questions and -- have

22  you taken depositions yet?

23         MR. GUTMAN:  No.  They are the only ones.

24         THE COURT:  Okay.

25         MR. GUTMAN:  Because we don't have documents, so

139

1   we're waiting for the documents.

2          THE COURT:  You don't have any documents?

3          MR. GUTMAN:  Well, we have 700,000 pages of

4   documents that are documents that mostly came from prior

5   litigations, but on the issues that were really interested

6   in, we don't have the documents unfortunately, Your Honor.

7          And so owe.

8          THE COURT:  Wait, okay.  So, look.  You've got

9   the documents.  You review them.  And this is for the

10  non-inventor?

11         MR. GUTMAN:  Yes.  The e-mail custodians.

12         THE COURT:  Non-custodial data sources.  Right?

13         MR. GUTMAN:  Yes.

14         THE COURT:  And they've represented that,

15  they've identified these eight people and said they're the

16  most likely to have discoverable information.  Is that

17  correct?

18         MR. GUTMAN:  Yes.

19         THE COURT:  All right.  So you now look over

20  your documents, and if you find, wait a second.  Joe Smith

21  here is the guy.  He has the most knowledge and they didn't

22  identify him, I'm going to be very receptive to taking

23  remedial action.  Right?  But --

24         MR. GUTMAN:  Well, part of the problem --

25         THE COURT:  Presumably, they thought about who

140

1   the eight most knowledgeable people were before they listed

2   them.  So you've got that information.  You're getting the

3   documents.

4          Why isn't that sufficient?

5          MR. GUTMAN:  Well, part of the problem, Your

6   Honor, is we're running out of the time.  I mean, you

7   know, the January date is upon us.  Discovery has been

8   pending.

9          THE COURT:  Right.  But I can tell you, I mean,

10  just to give you an example.  I mean, going into a trial, if

11  it's a blatant example where they play games like that, they

12  would suffer consequences in trying the case.  I mean, I'm a

13  big rule guy.  I hated gamesmanship when I was in private

14  practice.  I can guarantee you if there were games played

15  like that, I'm not expecting it at all, but if there were,

16  they would suffer -- they would be precluded from presenting

17  certain evidence.  There are all sorts of things you would

18  have at your disposal if games were played.

19         You don't have any evidence of that, do you?

20         MR. GUTMAN:  We do.  Not that they are playing

21  games, but that there are custodians -- they concede that

22  manufacturing of Avastin is relevant, discoverable

23  information that we're seeking that they have produced in

24  part.  I mean, they've produced --

25         THE COURT:  But that's my point.  They've got to

141

1   produce it if it's responsive to documents even if it is not

2   in the custody of one of the eight people.  Correct?

3          MR. GUTMAN:  But then we don't get the ESI

4   discovery that bears on that issue because they're

5   arbitrarily restricting our access to ESI.

6          THE COURT:  That would be incredibly risky of

7   them to -- I mean, I would be very, very surprised.  I'm not

8   saying it doesn't happen in the litigation.

9          MR. GUTMAN:  Well, all of the custodians, Your

10  Honor, that they've identified are the images related

11  custodians.  They've produced documents.

12         THE COURT:  Well, wait.  I thought the

13  particular -- we're referring to the provision in the

14  agreement that requires them to provide a list of eight

15  non-inventor custodial data sources.  I mean, it makes sense

16  to me that would be damages --

17         MR. GUTMAN:  No, Your Honor, because the

18  inventors don't know about the manufacturing of Avastin.

19  That's a separate issue from the inventor custodial issue,

20  which bears on the patent issues.  I'm talking about

21  manufacturing relating to Avastin, their commercial product

22  that they are making a lost profits claim for and a

23  reasonable royalty claim.  And so the point of that

24  discovery is different from the point of the inventor

25  discovery.  The inventor discovery is directed and focused

142

1  on the patents. The manufacturing discovery that I'm
2  talking about is not an inventor issue. It bears on how
3  they manufacture the commercial product that is the
4  foundation for their lost profits claim.
5  THE COURT: Okay. Mr. Silver, you're familiar
6  with the rule. You agree with me. Right? And I'm reading
7  a quote. You have an obligation to identify the eight
8  custodial witnesses that are most knowledgeable, have the
9  most knowledge about the issues in this case. Correct?
10  MR. SILVER: Yes, Your Honor.
11  THE COURT: Okay.
12  MR. SILVER: And we believe we did that. They
13  get 26 inventor custodians and then 8 non-inventor
14  custodians. And I will just add, they're getting a lot of
15  non-custodial data source, including our BLA that talks
16  about the manufacturing of our product, so we're kind of
17  scratching our head as to why it is that they are concerned
18  that they are not getting manufacturing information.
19  THE COURT: Okay. But in fairness, if all eight
20  people, if none of the eight people have knowledge about the
21  manufacturing process, that strikes me as odd.
22  I mean, so, Mr. Berl, you're perplexed. Do you
23  want to address that?
24  MR. BERL: If I could maybe address that, Your
25  Honor.

143

1  First, what Mr. Gutman said about none of the
2  inventors knowing anything about the manufacture of Avastin,
3  that's not true. I don't know why he would say that.
4  THE COURT: Okay.
5  MR. BERL: Some of them do, in fact.
6  THE COURT: In fairness, that's a good point. I
7  said if none of the eight. So what I mean to say though is,
8  I will be shocked if the 16 most knowledgeable people, of
9  the 16, no one can speak to in an informed way the
10  manufacturing process. Right? We're all on the same page
11  on that?
12  MR. BERL: I'm not sure where you're getting 16.
13  It's 34.
14  THE COURT: I'm sorry. What?
15  MR. BERL: There are 26 inventors. 34.
16  THE COURT: For some reason I thought there were
17  eight inventors. Okay.
18  MR. BERL: With that proviso, I agree with you.
19  THE COURT: All right. So, Mr. Gutman, you
20  know, they've now been in court. They've said that you have
21  the most knowledgeable folks, so --
22  MR. GUTMAN: Well, the date --
23  THE COURT: I'm telling you, if it turns out
24  your inventors don't know anything about the process, you
25  would have remedies available to you.

144

1  MR. GUTMAN: Yes. And it's not about the
2  patented methods. What I am referring to is
3  manufacturing --
4  THE COURT: I know what you are referring to. I
5  didn't limit it to patenting. I said the manufacturing
6  processes.
7  MR. GUTMAN: If they are not planning on calling
8  any witnesses to talk about their manufacturing process for
9  Avastin, then I guess they don't have to produce any
10  discovery about their manufacturing process.
11  THE COURT: And that's an example of what I
12  meant, that there would be a consequence. If they called up
13  the expert within the company on manufacturing and that
14  person was never identified to you, I would be troubled by
15  that personally as a judge and probably wouldn't let the
16  person testify.
17  You guys all get that. Correct?
18  MR. SILVER: Yes. Yes, Your Honor.
19  THE COURT: All right.
20  MR. GUTMAN: Yes, Your Honor. I mean, you know,
21  for all of these custodians, by the way, and this is one of
22  the reasons why Amgen is concerned about it. The search
23  terms are all limited to, on the inventor side, to patent
24  issues, and on the other eight custodians, all the search
25  terms are directed to damages related terms. And so there's

145

1  no effort here to produce any ESI relating to the
2  manufacturing of Avastin, and so if what I'm hearing is
3  correct, that they won't be able to introduce any evidence
4  relating to the issue of how Avastin is manufactured without
5  producing this ESI because they've taken no measures to
6  actually provide ESI on manufacturing, then I guess we can
7  address it down the road.
8  THE COURT: I would just say this. I think
9  enough has been said. I can't imagine allowing a witness
10  out of the blue to come from Genentech who is the person
11  most knowledgeable about manufacturing and allowing that
12  person to testify if that person wasn't identified.
13  Now, and so I hear you. I can't figure that out
14  now. I'm not in a position. And you are going to have the
15  benefit though of documents that maybe not run through the
16  ESI terms, but they have to be responsive. They have to
17  produce the documents that are responsive to your request.
18  And presumably, you would be able to identify if you
19  reviewed them then, individuals that you believe would be
20  most knowledgeable. Correct?
21  MR. GUTMAN: Well, certainly more knowledgeable
22  than the custodians they identified relating to damages.
23  THE COURT: Right.
24  MR. GUTMAN: Yes, Your Honor.
25  THE COURT: And I guess you get to depose the

146

1    eight people -- well, I don't even know.  Did you guys work
2    out how many depositions you all get?
3            MR. BERL:  There's an hour's limit in the
4    scheduling order.
5            MR. GUTMAN:  220 hours per side, Your Honor.
6            THE COURT:  All right.  If you find none of
7    those inventors have any knowledge about the manufacturing
8    process, you can come back to the Court.
9            MR. GUTMAN:  Thank you, Your Honor.
10           On the last issue about the documents served or
11   filed by adverse parties in other litigations where these
12   same patents have been litigated, the issue there is that
13   obviously, the positions taken by the other parties with
14   respect to, for example, invalidity or unenforceability of
15   these very same patents and also claim construction issues
16   and positions that the parties have taken in those
17   litigations is highly relevant to the issues in this
18   case.
19           This is unlike the --
20           THE COURT:  Okay.  That's good.  I've only got a
21   couple minutes.  Mr. Berl, are you addressing these?
22           MR. BERL:  Yes, I am.
23           THE COURT:  Why don't you step up.
24           MR. BERL:  I'm happy to address any of the
25   issues you would like.

147

1            THE COURT:  Start with the last one he
2    addressed, please.
3            MR. BERL:  Sure.  There have been 37 litigations
4    regarding these patents, including IPRs.  For 20 of them,
5    they're getting the entire file.  For the other ones,
6    they're getting all of our reports and documents, which is
7    more than they're willing to give us in the Hospira case.
8    And Your Honor said we don't even get Amgen's statements.
9    We're giving them Genentech's statements.  We're just not
10   giving them third-party statements so that someone else can
11   do their homework for them and figure out what invalidity
12   defenses they should have included in their pre-litigation
13   exchanges under the BPCIA.  So I don't see any basis.
14           THE COURT:  I agree.  I already indicated I was
15   inclined to deny this.  I'm going to deny that request.
16           MR. BERL:  I will work sort of backwards then.
17           THE COURT:  Fine.
18           MR. BERL:  With respect to the 2015 cutoff, that
19   was labeled by Mr. Gutman as being arbitrary.  It was not
20   arbitrary.  That cutoff emanated from our investigation when
21   we asked people who had knowledge at the company, when did
22   you start doing modeling, the sorts of analysis that
23   Mr. Gutman says he wants.  When did that begin at the
24   company?  And the answer was 2015, so it was not arbitrary
25   in any way.  It was informed by our investigation.

148

1            THE COURT:  How about just answer his contention
2    that you were asking for information that goes back to 2009,
3    what's good for the goose is good for the gander.
4            MR. BERL:  We're asking for different kinds of
5    information, obviously.  For example, if they developed
6    their manufacturing process in part in 2009, that's
7    obviously relevant to infringement.  That doesn't mean every
8    document created in 2009 is discoverable in the case.
9            THE COURT:  All right.  I agree with you on
10   that.  I'm going to deny Amgen's request for relief.  At
11   this stage, I think this January 1, 2015 cutoff is
12   reasonable.
13           MR. BERL:  I suppose the last issue is whether
14   they get documents before the deadline of the schedule.
15           THE COURT:  And there are two related to that.
16   Right?  They've got the non-custodial, the non-e-mail and
17   then the custodial.
18           MR. BERL:  Correct.
19           THE COURT:  All right.
20           MR. BERL:  So I guess we don't view it with that
21   sort of distinction.  Obviously, those are two buckets,
22   bought we're working intensely.  As Your Honor noted, there
23   are multiple Genentech cases.  The client is turning over
24   all sorts of files to try and meet these deadlines.  We're
25   working diligently and we'll meet them.

149

1            We don't view it as we'll do custodial now and
2    then we'll do non-custodial.  We're doing everything to meet
3    the deadline that was set and negotiated by the parties and
4    entered by the Court.  We intend to do that.
5            The particular documents that he says he needs
6    beforehand such as the date of invention, in the first
7    instance, I agree with Your Honor, it doesn't really affect
8    claim construction in any meaningful way.  It's really an
9    invalidity issue.  Moreover, now that the claim construction
10   briefing dates have been adjusted, he's actually going to
11   get all of those documents before he has to submit a brief
12   to the Court.
13           THE COURT:  Can you agree to that?
14           MR. BERL:  Well, the deadline is January 11th.
15   We are going to meet the deadline.  January 25th happens two
16   weeks after January 11th.
17           THE COURT:  All right.  One thing I would just
18   encourage you to do, but, look.  He has given some ground
19   here.  Okay.  You ought to give some ground.  The deadline
20   is in place, which is why I'm not getting into it, but I
21   will say, again, it's naive perhaps, but in the spirit of
22   the cooperation, we're trying to get the case management,
23   you ought to try to expedite it.
24           And then, lastly, I would say, look, to both
25   sides, I absolutely, even though I'm only a new judge, but I

1   do think it's only fair to punish parties that play games in
2   discovery when it comes to trial, and I will not hesitate to
3   preclude testimony from being elicited or adduced if it's
4   unfair to the discovery practices.  All right.
5           So I'm going to deny the request to prematurely
6   before the deadlines provide the non-custodial and the
7   custodial e-mails, but I believe, Mr. Gutman, I've addressed
8   it, so you won't be prejudiced.
9           MR. GUTMAN:  Thank you, Your Honor.
10          THE COURT:  I think that disposes of all the
11  discovery issues.
12          MR. BERL:  From our side.
13          MR. GUTMAN:  I believe so.
14          THE COURT:  Are you agreeable to consolidate the
15  two cases?
16          MR. GAFFNEY:  Yes.
17          MR. BERL:  Yes, Your Honor.
18          THE COURT:  All right.  So, Mr. Silver, do you
19  want to take care of that?
20          MR. SILVER:  I will do a stipulation with
21  Mr. Higgins.  We'll file everything in the first-filed case
22  going forward, Your Honor.
23          THE COURT:  Okay.  That would be great.
24          MR. SILVER:  Thank you.
25          THE COURT:  And then we'll -- one second.

151

1           All right.  So we're going to get out a revised
2   scheduling order that will reflect all the rulings today,
3   and just to repeat, what I ruled today orally will serve as
4   the Court's order with respected to the discovery issues
5   that were brought to our attention.
6           Is there anything else that needs to be
7   addressed today?
8           MR. BERL:  No, Your Honor.  Thank you so much
9   for your time.
10          MR. GUTMAN:  Thank you.
11          THE COURT:  All right.  Thank you.  We're
12  adjourned.
13          (Court recessed at 3:00 p.m.)
14                  -  -  -
15
16
17
18
19
20
21
22
23
24
25